

Whitman L. Holt
Bankruptcy Judge

*NOT FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Lead Case No. 18-01681-WLH11 |
| MENSONIDES DAIRY, LLC, et al., | (Jointly Administered) |
| Debtors. | **MEMORANDUM DECISION** |

　　Disputes among employers and their employees are as old as the employment relationship itself.  The saga continues around the globe in courts, governmental agencies, and human-resources departments.  Here, the parties ask the court to resolve numerous interrelated employment disputes as part of the claims-allowance process in affiliated chapter 11 bankruptcy cases.  This decision details the court's ruling based on the record established during a lengthy evidentiary hearing.

## BACKGROUND & PROCEDURAL POSTURE

　　The debtors own and operate a dairy in Mabton, Washington.  Debtor Mensonides Dairy, LLC is the lead operating debtor.  Joint debtors Art Mensonides and Trijntje (a/k/a Theresa) Mensonides are individuals who own the limited liability company and personally guaranteed some of its debts.  The debtors' chapter 11 cases have been jointly administered and the debtors confirmed a joint chapter 11 plan of reorganization.[1]  Following the effective date of their plan, the debtors have continued to operate the dairy as reorganized debtors.

---

[1]　*See* ECF Nos. 498, 499.

During the course of their chapter 11 cases, the debtors realized that some parties intended to assert employment-related claims against their bankruptcy estates. At the debtors' request, the court established a bar date, special ballot, special notice, and special claim form regarding these claims, which are classified as Class 12 and Class 13 claims under the debtors' plan.[2]

The Martinez Aguilasocho & Lynch law firm filed a consolidated proof of claim on behalf of more than forty individuals who were employed by the dairy during a "claims period" of June 6, 2015 to June 13, 2018, which proof of claim was designated as claim number 43.[3] In their proof of claim, claimants assert various wage and hour violations allegedly arising from their employment at the dairy. Over time, the number of claimants who remain associated with claim number 43 has been narrowed to twenty-seven individuals.

The debtors timely objected to claimants' proof of claim, including based on an initial declaration from the dairy's herd manager and several exhibits.[4] After addressing various preliminary matters, the court set the matter for an evidentiary hearing, which occurred over nine days between October 2020 and May 2021. During the hearing the court heard live testimony from twenty-one of the claimants; debtor Art Mensonides; and Mr. Mensonides' daughters, Kristyn and Amy, both of whom work at the dairy in management positions. The court further admitted numerous exhibits and deposition excerpts. After the close of evidence, the court received post-hearing briefing from both sides and heard closing argument. The matter is now ready for decision.

## GENERAL PRINCIPLES

### *Jurisdiction & Power*

The court has subject matter jurisdiction regarding these bankruptcy cases and the debtors' claim objections pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' disputes regarding the allowance or

---

[2]     *See* ECF No. 402 ¶ 5 on p. 3, ¶ 2.2 on p. 5, Ex. 3 (special ballot form), Ex. 4 (special notice form), Ex. 5 (special proof of claim form).

[3]     Class 12 or Class 13 proofs of claims were also filed by the lead plaintiffs in a proposed class-action lawsuit commenced before the petition date (although no class had ever been certified), the Washington State Department of Labor and Industries, and several individuals. The debtors objected to all these claims, settled with the putative lead plaintiffs and the government, and obtained orders disallowing the individuals' claims. *See, e.g.*, ECF Nos. 701, 727, 749, 841.

[4]     *See* ECF Nos. 543, 571.

disallowance of claims against the estates are statutorily "core" and the issues presented will "be completely resolved in the bankruptcy process of allowing or disallowing claims."[5]  Indeed, the law has recognized for generations that the claims-allowance process is an inherent part of the bankruptcy system and that bankruptcy courts should therefore fully resolve the entitlements of any parties choosing to assert claims against the estate.[6]  Accordingly, the court may properly exercise the judicial power necessary to finally decide the parties' disputes.

### *Allocation of Burdens*

The bankruptcy claims process involves a series of shifting presumptions and burdens.  Proofs of claim that are "executed and filed in accordance with" the Federal Rules of Bankruptcy Procedure "constitute prima facie evidence of the validity and amount of the claim" and will be "deemed allowed" unless a party in interest objects.[7]  If an objection is filed, then "the party objecting to a proof of claim has the burden of presenting substantial factual basis to overcome the prima facie validity of a proof of claim and the evidence must be of probative force equal to that of the creditor's proof of claim."[8]  If the objector meets this shifted burden, then the burden reverts back to the claimant to prove up its claim by a preponderance of the evidence, which means "[t]he ultimate burden of persuasion remains at all times upon the claimant."[9]  In attempting to meet this ultimate burden, the claimant can no longer rely on the initial evidentiary effect of the proof of claim and must produce additional admissible evidence to prove the claim's validity.[10]  Likewise, the objector is not required to disprove the asserted claim.[11]

---

[5]   *See* 28 U.S.C. § 157(b)(2)(B); *Stern v. Marshall*, 564 U.S. 462, 487 (2011).

[6]   *See, e.g.*, *Gardner v. New Jersey*, 329 U.S. 565, 573-74 (1947) (Douglas, J.) (explaining how the claims-allowance "process is, indeed, of basic importance in the administration of a bankruptcy estate whether the objective be liquidation or reorganization," including because "[t]he whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*"); *Wiswall v. Campbell*, 93 U.S. (3 Otto) 347, 351 (1876) ("Every person submitting himself to the jurisdiction of the bankrupt court in the progress of the cause, for the purpose of having his rights in the estate determined, makes himself a party to the suit, and is bound by what is judicially determined in the legitimate course of the proceeding.  A creditor who offers proof of his claim, and demands its allowance, subjects himself to the dominion of the court, and must abide the consequences.").

[7]   11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).

[8]   *Reger v. Essex Banks (In re Landes)*, 626 B.R. 531, 545 (Bankr. E.D. Cal. 2021) (citing authorities).

[9]   *See, e.g.*, *Lundell v. Anchor Constr. Specialists, Inc*., 223 F.3d 1035, 1039 (9th Cir. 2000).

[10]   *See, e.g.*, *In re Fidelity Holding Co*., 837 F.2d 696, 698 (5th Cir. 1988).

[11]   *See, e.g.*, *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990).  Avoiding a framework in which the objecting party has the ultimate burden of disproving the claim sensibly reflects the reality that "as a practical matter it is never easy to prove a negative."  *Elkins v. United States*, 364 U.S. 206, 218 (1960).

"The burden is, therefore, just as it would be in a non-bankruptcy lawsuit in which the creditor is attempting to recover money from the debtor."[12]

Here, the claimants filed proofs of claim that carried prima facie force, but the debtors satisfied their burden of presenting a substantial factual basis to overcome that prima facie validity, including through sworn declarations, depositions of several claimants, and the testimony and exhibits offered by the debtors at the evidentiary hearing. As such, each of the claimants must now be held to their ultimate burdens of proof and persuasion, including establishing all necessary elements of their asserted claims by a preponderance of the evidence.

### *Applicable Nonbankruptcy Law*

Bankruptcy Code section 502(b) contains several bases for disallowance of bankruptcy claims, including when "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."[13] Section 502(b)(1) operates to disallow "any claim unenforceable under applicable nonbankruptcy law."[14] Here, there is no dispute that Washington state law is the applicable nonbankruptcy law, which in turn means that claimants must establish that their asserted claims are enforceable rights to payment under Washington state law.

Washington employment law is complex and best considered in the context of specific claim categories, which the court does below. One overarching principle is relevant, however: Washington courts generally do not permit recovery of damages that are speculative or approximate.[15] The need for a claimant to establish damages that are relatively certain applies in the context of wage-and-hour claims and often precludes associational standing or representative testimony,

---

[12] *In re Wilhelm*, 173 B.R. 398, 401 (Bankr. E.D. Wis. 1994).

[13] 11 U.S.C. § 502(b)(1).

[14] *E.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1052 n.15 (9th Cir. 2002).

[15] *See, e.g.*, *Saddle Mountain Minerals v. Joshi*, 152 Wn.2d 242, 258-59 (2004) ("While we do not demand absolute certainty, we do not grant damages that are too remote or speculative."); *In re Marriage of Fairchild*, 148 Wn. App. 828, 832 (2009) ("Likewise, damages must be supported by competent evidence in the record. To be competent, the evidence or proof of damages must be established by a reasonable basis and it must not subject the trier of fact to mere conjecture."); *Alliance Shippers, Inc. v. Always Transp., Inc.*, 2011 U.S. Dist. LEXIS 108120, at *9 (E.D. Wash. Sept. 16, 2011) ("Under Washington law, evidence sufficiently proves damages when it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture." (cleaned up)).

**MEMORANDUM DECISION**      Page 4

at least outside of the class action context.[16]  This basic legal principle is not unique to Washington state, but rather is part of broader common law requiring a "plaintiff to prove, with certainty, both the existence of damages and the causal connection between the wrong and the injury.  No damages could be recovered for uncertain, conjectural, or speculative losses."[17]  As such, a necessary part of claimants' burden here is to prove by a preponderance of the evidence the nonspeculative amount of damages relating to each claim category.[18]

## ANALYSIS OF SPECIFIC CLAIM CATEGORIES

Claimants do not all assert a single type of claim, but overlapping categories or "buckets" of claims that differ based on the nature of the work done at the dairy by the applicable subgroup of claimants.  The court has accordingly divided its analysis of the law and the facts across these claim categories, which are now addressed in turn.

### Travel and Wait Time

For reasons not relevant here, the dairy generally prohibits nondairy vehicles from driving onto the working area of the dairy – this includes those vehicles owned by employees and visitors.[19]  This policy required claimants to park their personal vehicles at a parking lot located outside the dairy's entrance.  From there, claimants either traveled by foot or via a dairy provided vehicle to reach the

---

[16]  *See, e.g.*, *Wash. State Nurses Ass'n v. Yakima HMA, LLC*, 196 Wn.2d 409, 419-22 (2020) (en banc).

[17]  *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 533 n.26 (1983).  *See also, e.g.*, *Palmer v. Connecticut R. & Lighting Co.*, 311 U.S. 544, 565-66, 569 (1941) (Douglas, J., dissenting) (explaining that whenever claims are asserted in a bankruptcy case, "the evidence must be sufficient for the exercise of an informed judgment as to the amount," which means that if "the existence or extent of the damage is a matter of mere conjecture or guesswork, the claim will be denied"; subsequently referencing this "well-established rule against allowance of speculative damages").

[18]  Washington courts sometimes work around this rule by awarding "nominal damages."  *See, e.g.*, *Ford v. Trendwest Resorts, Inc.*, 146 Wn.2d 146, 158 (2002) (en banc) (concluding that nominal damages were the appropriate remedy for breach of an at-will employment contract); *Bellingham Bay & British Columbia R. Co. v. Strand*, 4 Wash. 311, 314 (1892) ("Nominal damages never purport to be real damages. They are awarded where, from the nature of the case, some injury has been done, the amount of which the proofs fail entirely to show.").  Here, however, claimants declined the court's several invitations to brief whether they are seeking nominal damages and, if so, in what amounts.  Therefore, the court will apply Washington's usual rule requiring competent proof of nonspeculative actual damages.

[19]  *See* ECF No. 845 at 101:10-14 (Arthur Mensonides testifying that no vehicles besides company vehicles are permitted on the dairy).

**MEMORANDUM DECISION**          Page 5

timeclock employees used to clock in and out for work.[20]  Most dairy employees chose almost exclusively to utilize a dairy provided vehicle for this final part of their commute.  Claimants contend that the travel time they spent on the company vehicles amounted to compensable working time under Washington's Minimum Wage Act ("MWA") and seek damages in the form of wages for that time.  Unfortunately, claimants neither cite nor discuss any binding authority to support their claim but opt to rely on administrative policies promulgated by Washington state agencies.  After a review of the applicable law, the court concludes claimants are not entitled to the damages they seek for two reasons.

*First*, assessing the facts under applicable law, the court concludes that the time at issue is not compensable as part of claimants' work.  When determining whether travel time is compensable under the MWA the Washington Supreme Court has observed that no statute addresses the issue, so courts should assess whether the nature of travel and related time in question falls within the definition of "hours worked" under WAC 296-120-002(8).[21]  Thus, travel time is compensable if it constitutes "hours worked."  In turn, "'[h]ours worked' . . . mean[s] all hours during which the employee is authorized or required . . . to be on duty on the employer's premises or at a prescribed workplace."[22]  Thus, for travel time to be compensable, an employee must be both (i) on duty and (ii) located at either the employer's premises *or* a prescribed workplace.  In *Anderson v. State, Department of Social & Health Services*, a Washington appellate court applied the standard to state employees traveling via a ferry ride of twenty minutes provided by their employer.  During the ride, the employees "engage[d] in various personal activities, such as reading, conversing, knitting, playing cards, playing hand-held video games, listening to CD (compact disc) players and radios, and napping."[23]  The *Anderson* court found that the employees "perform[ed] no work during the passage" but acknowledged that the employees were not entirely free from employer restrictions as "they assert that they are subject to discipline."[24]  Based

---

[20]   *See, e.g.*, ECF No. 849 at 230:24-231:5 (herd manager testifying that the dairy provided company vehicles for its employees to use between the parking lot and timeclock at the beginning and end of the day).

[21]   *See Stevens v. Brink's Home Sec., Inc.*, 162 Wash. 2d 42, 47 (2007) (en banc).  While the Washington Supreme Court uses WAC 296-126-002(8) as guidance for these purposes, it is worth noting that the regulation implements the Industrial Welfare Act under RCW 49.12 rather than the MWA under RCW 49.46.

[22]   *See id*. (citing WAC 296-126-002(8)).

[23]   115 Wash. App. 452, 454, *review denied*, 149 Wash.2d 1036 (2003).  It is instructive not only that the Washington Supreme Court denied further review but that it later extended the *Anderson* court's reasoning when evaluating the merits of another case regarding employees' travel and commute times.  *See Stevens*, 162 Wash. 2d at 48-49.

[24]   *Id*.

**MEMORANDUM DECISION**         Page 6

on these facts, the *Anderson* court concluded that the travel time was not compensable because the employees were neither "on duty" nor at a "prescribed work place."[25] Here, there is no genuine dispute that the dairy employees were generally free from work assignments during the travel time. Those claimants who testified on the matter readily conceded this point – though some testified that the dairy prohibited them from engaging in certain activities such as vandalizing the transport vehicles or harming others.[26] No other claimants identified any job-related tasks they had to perform during the relatively brief commute and the herd manager credibly testified that the dairy imposed none.[27] Thus, similarly to the plaintiffs in *Anderson*, claimants here were not "on duty" and therefore the travel time does not constitute "hours worked."[28]

---

[25] *Id.* at 135.

[26] *See* ECF No. 850 at 71:21-72:3 (Alberto Flores, a milking shift lead, testifying that milking employees who rode a bus from the parking lot to the milk barn to clock in had no work-related tasks while waiting for or riding the bus and the only limitation on their activity was: "[T]o not destroy the bus. Try to take care of it. It was for our own good. And to have it clean, to not break windows [or] rip up the seats, and that we should have, you know, the bus in good conditions [sic]"); ECF No. 847 at 29:2-10 (Ana Cruz testifying that she had no work-related tasks during the ride from the parking lot to the milk barn); ECF No. 849 at 91:12-24 (Armando Madero testifying that he had no work-related tasks while waiting for or riding the bus); ECF No. 842 at 96:18-98:5 (Candelario Herrera testifying that he had no work-related obligations and could do as he pleased with few limitations while traveling from the parking lot); ECF No. 846:18:17-19:14 (Hector Ibanez testifying he had no work-related tasks prior to punching in); ECF No. 844 at 23:20-24:21 (Joaquin Mendoza testifying that he considered his pre- or post-shift work-related duties amounted to either driving a company vehicle or "walk[ing] from where you parked . . . to where the punch-in machine is . . . [t]hat's what I'm saying is job duties"); ECF No. 849 at 154:6-25 (Jorge Ramirez testifying that he could do anything he wanted while on the bus and waiting for others to board); ECF No. 28:12-29:13 (Jose Martinez testifying that he had no work-related requirements before or after he clocked in and out); ECF No. 848 at 178:24-180:6 (Jose Noel Ceja testifying that neither he nor other employees performed any work on the commute from the parking lot to the timeclock); ECF No. 843 at 25:1-6 (Maria Guadalupe Velasquez testifying that she had no work-related requirements on the ride from the parking lot to the timeclock and that "[y]ou could do what you want"); ECF No. 849 at 37:2-38:14 (Raul Vasquez testifying that his only job duties during the commute was to "drive up and back" and when not driving he had no job duties at all); ECF No. 842 at 35:8-36:23 (Victor Licona testifying that his only duties while *walking* from the parking lot to the timeclock was to "make sure we don't run over anyone, and . . . drive slowly, not to go very fast" and iterating that he performed no other work-related tasks); *see also* ECF No. 844 at 95:7-23 (Jesus Gallegos successfully avoided answering counsel's straightforward question about the extent of any job requirements while riding to the dairy on cross examination).

[27] *See* ECF No. 845 at 125:8-10.

[28] When seeking clarification of claimants' arguments related to travel time, the court asked claimants' counsel to explain the difference between the nature of the travel time alleged here and the example of office workers who park their vehicles in parking garages, then walk to their building, only to then wait for and ride an elevator. Counsel asserted that the time could be compensable due to the duration of the travel, though she provided no authority for her position. *See* Audio File, ECF No. 858 at 56:35-58:53. Though the court finds the argument unconvincing, the court need not decide the issue as the travel time at issue here is negligible compared to that in *Anderson*. Here, claimants have conceded that the drive time took about three minutes and is approximately one quarter of a mile. *See* ECF No. 817 at ¶ 8. In contrast, the *Anderson* court found plaintiffs' travel time not compensable although the "ferry passage takes approximately 20 minutes **each way**." *See* 115 Wash. App. 454 (2003) (emphasis added). Further, while the *Anderson* court did not specifically discuss the matter, it necessarily understood that plaintiffs were required to arrive early to catch the ferry just as claimants needed to

---

**MEMORANDUM DECISION**              Page 7

**Second**, and independently, the evidence shows that the dairy made its vehicles available to its employees for the employees' convenience rather than for the benefit of the dairy. Specifically, the dairy gave its employees the option to travel by foot from the parking lot or to use the provided vehicles to make the trip.[29] The overwhelming majority of claimants conceded this and testified that they opted to use the dairy provided vehicles to avoid walking.[30] While some claimants alleged that they understood that they were prohibited from walking, such testimony is not credible for a variety of reasons. As an initial matter, those claimants who so testified failed to reconcile these allegations with the contrary testimony of other claimants who readily conceded they could walk. Further, some claimants who testified that they were prohibited from walking made the allegation

---

do here. Finally, the *Anderson* court did not indicate that the duration of the travel and wait time itself factored into its decision.

[29] *See* ECF No. 845 at 101:23-102:8 (Arthur Mensonides testifying that employees may travel from the parking lot on the bus, by pickup, on a piece of equipment, or "[t]hey can walk" and that the dairy provided the vehicles for employees "[b]ecause it was easier for them"); *id.* at 113:15-20 (herd manager testifying that she walked to the timeclock and that other employees walked or drove); *id.* at 123:24-124:6 (herd manager testifying that employees are not required to take the company vehicles from the parking lot to the timeclock).

[30] Alfredo Sanchez testified that he drove the company provided vehicle, rather than walked, because it was more convenient to take the vehicle. *See* ECF No. 842 at 120:13-19, 121:14-16. Antonio Licona similarly confirmed that he could "walk to the punch clock from the parking lot" and that "he had to go walking to clock in" on occasions he "was running a little bit late" and his coworkers wouldn't wait. *See* ECF No. 848 at 32:21-23, 33:15-19, 35:20-23. Armando Madero testified he could walk but chose to ride because it was more convenient and that, during his orientation, Kristyn Mensonides informed him that he would have to walk if he arrived late for the bus, which he sometimes did. *See* ECF No. 849 at 73:9-18, 75:16-18, 83:15-84:9. Candelario Herrera testified that he sometimes walked from the parking lot to the timeclock but chose to drive because he had a company vehicle available. *See* ECF No. 99:18-24. Esekiel Balderama testified that he could walk from the parking lot to the timeclock but he "would have to arrive a lot earlier, you know, to walk" if not using the company provided vehicles which he preferred to do. *See* ECF No. 846 at 65:5-8, 67:4-23, 68:23-70:3. Guadalupe Adame testified that he could walk to the timeclock from the parking lot. *See* ECF No. 848 at 92:9-17. Hector Ibanez testified that he could walk to the parking lot after work if he didn't want to wait for the bus but preferred to wait for the bus out of convenience. *See* ECF No. 846 at 16:22-24,17:24-18:7. Joaquin Mendoza testified that if there was no ride available from the parking lot he would walk to clock in. *See* ECF No. 844 at 23:11-24. Jorge Ramirez testified that he could walk from the parking lot to the timeclock, but he took the company provided vehicle for the sake of convenience. *See* ECF No. 849 at 156:22-157:10. Jose Martinez testified that he could, and did, travel by foot between the parking lot and the timeclock and that there was no prohibition from doing so. *See* ECF No. 850 at 21:19-21, 22:21-23, 24:20-25. Jose Noel Ceja testified that he was permitted to, and did, walk but showed up early at the parking lot to ensure he could ride. *See* ECF No. 848 at 163:6-9, 178:3-9. Maria Guadalupe Velasquez testified that she and other employees were permitted to walk from the parking lot to the timeclock but took the company provided transportation for the sake of convenience. *See* ECF No. 843 at 21:1-5, 24:3-16. Raul Vasquez testified that there was no requirement that people take company transportation, but he did so out of convenience. *See* ECF No. 849 at 26:12-27:2. Victor Licona testified that he would walk from the parking lot to the timeclock when he was late for work and missed a ride (then a lengthy back and forth ensued about Mr. Licona's perception of the duration of his walk and the distance travelled). *See* ECF No. 842 at 30:25-34:6.

---

even more puzzling by testifying that they actually did walk at times.[31] Other claimants' testimony simply lacked credibility.[32] Based on the totality of the record, the court finds no credible evidence showing claimants were prevented from walking the approximate quarter mile.[33] Simply because the dairy permitted its employees to use company vehicles to make the trip does not transform the travel time into "hours worked."[34] For these reasons, the court determines there is no factual or legal bases to award claimants damages for using company provided transportation between the parking lot and timeclock.

In addition to testimony related to travel and wait times, several claimants alleged they performed maintenance checks on company-owned vehicles before driving the vehicles to the timeclock. While claimants' post-hearing brief does not specifically identify the claims asserted by each individual claimant, the associated declaration of claimants' counsel appears to indicate eight claimants seek damages for performing these maintenance checks.[35] The court's review of claimants'

---

[31] For example, Adan De la Mora initially testified that he understood walking into the dairy from the parking lot was discouraged but later, when asked how he returned to his car at the end of the workday, he readily responded, "I would look for a ride or I would go walking" and "I would go walking to the -- to the parking lot," which he estimated took about ten minutes and again conceded that "[f]rom the shop to the parking lot, I would walk there." *See* ECF No. 846 at 96:3-13, 104:1-23, 106:10-13.

[32] Ana Cruz initially testified that she didn't walk because nobody told her she could do so but also testified no one told her she couldn't. She later reversed her testimony and stated that a supervisor at the dairy prohibited her from walking. *See* ECF No. 847 at 9:1-5, 21:1-6, 30:12-18, 31:7-32:4. Confusingly, Jesus Gallegos testified that he wasn't required to take company transportation to and from the parking lot yet also testified that he didn't walk out of fear of getting fired or being accused of stealing – however, on cross examination, Mr. Gallegos conceded that, during his deposition, he clearly stated he could walk but preferred to take company transportation out of convenience. *See* ECF No. 844 at 95:14-99:2

[33] Several claimants inflated the distance in an apparent effort to bolster their claim, sometimes to an extreme degree. For example, Victor Licona testified that "for me, it was like four miles. You know I would go walking." *See* ECF No. 842 at 31:6-11. However, following the evidentiary hearing, the parties stipulated that the parking lot was "approximately one quarter mile from the milking parlor" where the timeclock is located. *See* ECF No. 817 at ¶ 8.

[34] This point is highlighted by *Anderson* where plaintiffs were **required** to use the employer provided transportation since ferry passage was the only possible mode of transportation.

[35] Common to claimants' other theories of liability, it is difficult to determine from claimants' filings the exact basis for the damages they seek here since counsel's declaration uses generic terms such as "pre-shift work" and a raw number to describe damages that appear attributable to subcategories such as travel time, waiting time, and maintenance checks. There is no indication what portion of the proposed award is attributable to each subcategory or a clear explanation regarding where, or how, each claimant or counsel derived the number. To identify the claimants at issue on this theory of liability, the court reviewed the declaration to assess exactly which claimants alleged damages for "pre-shift work," then followed the citations therein to review each claimant's testimony in order to finally determine which claimants alleged they performed maintenance checks. *See* Decl. of Charlotte Mikat-Stevens in support of Claimants' Post-H'rg Br., ECF No. 852 at 12:19-20 (Candelario Herrera citing ECF No. 842 at 87-88); *id.* at 14:19-20 (Ezekiel Balderema citing ECF No. 846 at 44-47); *id.* at 15:16-17 (Genaro Moreno citing ECF No. 848 at 102-106, 115-116); *id.* at 16:16-17 (Guadalupe Martinez Adame citing ECF No. 848 at 60-66, 89-92); *id.* at 20:16-17 (Joaquin Mendoza citing ECF No. 844 at

briefing and their counsel's declaration revealed no other claimants who seek damages on this issue.[36]  The court denies these particular claims on three bases.

**_First_**, as discussed in detail above, all but one claimant, Genaro Moreno, at issue testified that they knew they could walk or admitted that they actually did walk to the timeclock from the parking lot at times.[37]  Further, Mr. Moreno's testimony did not touch on whether he could walk to the timeclock but he did concede that he often rode with several coworkers also seeking damages for performing vehicle maintenance checks.[38]  Many of those coworkers testified that they often walked when late because their coworkers failed to wait.[39]  Based on this evidence, Mr. Moreno knew employees walked to the timeclock.  Thus, as it did above, the court finds that these employees chose to take the vehicles for their own convenience and any basic safety checks performed before doing so were in furtherance of that end and did not transform the activity to one "on duty."[40]

**_Second_**, with one exception, claimants have provided no methodology to properly estimate the number of days on which they performed maintenance checks.[41]  As discussed directly above, several of these claimants testified that they walked at times and often rode or drove with others, and Mr. Moreno specifically testified that he often drove or rode with other claimants who duplicatively seek damages on this very issue.[42]  Thus, according to their own testimony, these

---

8-10, 22-24); *id.* at 21:18-19 (Jorge Ramirez citing ECF No. 849 at 21:18-19); *id.* at 25:15-16 (Jose Noel Ceja citing ECF No. 848 at 156-163); *id.* at 30:12-13 (Victor Licona citing ECF No. 842 at 21-26).  Claimant Antonio Licona also appears to assert a claim regarding this issue, but counsel's declaration improperly cites to the testimony of Guadalupe Martinez Adame for support.  *See id.* at 11:2-3 (citing to ECF No. 848 at 60-66, 89-92).  However, Mr. Licona did testify that he performed maintenance checks.  *See* ECF No. 848 at 17:11-20:12.  Thus, the court will deem the issue preserved for Mr. Licona.

[36] Again, due to the lack of clarity in the briefing, this determination is based on the court's independent and careful review of each claimant's testimony to determine whether each contained allegations related to vehicle maintenance checks.

[37] *See* nn. 30, 31 *supra*.

[38] *See* ECF No. 848 at 138:22-139:14 (Genaro Moreno specifically identifying "Candelario Herrera, Jose Ceja, Esekiel Balderama, Victor Licona, or Joaquin Mendoza" as coworkers he rode with to the timeclock).

[39] *See* n. 30 *supra*.

[40] The employees could have left the vehicles near the timeclock at the end of the prior day's shift or walked to clock in before retrieving the vehicles.

[41] Jose Noel Ceja specifically testified that he performed vehicle maintenance checks only on about six occasions while he worked at the dairy.  *See* ECF No. 848 at 159:17-158:20.

[42] *See also, e.g.*, ECF No. 842 at 8 (Candelario Herrera testifying that "[w]hen [he] had the truck, [he] checked the truck" but when he "got in the machinery, [he] would just go on the ride"); ECF No. 849 at 159:5-160:8 (Jorge Ramirez testifying that he rode only as a passenger during much of his time as an outside employee and, as a nondriver, he had no responsibilities to perform maintenance checks); ECF No. 848 at 179:21-180:18 (Jose

---

claimants often did not perform maintenance checks or they often shared the task to an unknown extent with co-claimants and other unnamed coworkers. The claimed damages fail to reveal that claimants specifically accounted for these instances. Further, claimants provide no methodology to calculate specific damages or evidence from which to identify the frequency of the maintenance checks they did perform or how often, and to what extent, their coworkers assisted.[43] Thus, any calculation of damages regarding this issue would be entirely speculative, which is not permitted under Washington law.

*Third*, and finally, the court finds claimants' testimony related to the vehicle maintenance checks problematic. Claimants were often evasive and nonresponsive from questioning from debtors' counsel and just as often the responses were inconsistent or irrelevant.[44] On the other hand, the dairy's herd manager credibly testified that the dairy required employees to perform certain vehicle checks at the *end* of the day while clocked in and to complete a form checklist provided near the timeclock so employees could procure the form when clocking in.[45] The herd manager also expressed confusion about why employees would perform maintenance checks in the morning rather than at the end of the day after operating the vehicle during the day and familiarizing themselves with any maintenance issues.[46] The herd manager also testified that the dairy discontinued the process

---

Noel Ceja testifying that the first person to arrive would normally perform the maintenance check and "if we were all there together, well, we would all do it together to get it done quicker"); ECF No. 842 at 50:24-53:20, 54:23-55:1, 56:7-11 (Victor Licona testifying that he rode with approximately four or five other unidentified coworkers and stating only the driver performed the maintenance check and that he did not always drive and, inconsistently, later testifying that all passengers performed the same check in a "united effort").

[43] The declaration of claimants' counsel filed asserting raw numbers sheds no light on the matter. *See* n. 35 *supra*.

[44] *See, e.g.*, ECF No. 848 at 33:25-34, 35:7-14 (Antonio Licona testifying that he performed multiple maintenance tasks on the company vehicle at the end of the day and while on the clock but then testifying that he checked the oil the following morning on the same vehicle for unstated reasons and testifying that he often rode with other unidentified individuals who performed the maintenance checks); ECF No. 842 at 99:9-17 (Candelario Herrera testifying that he didn't check the oil at the end of the day while on the clock apparently because he wanted to go home for the day); ECF No. 846 at 46:12-47:1 (Ezekiel Balderama denying he could perform the checks *after* clocking in but then testifying that he let the vehicle sit to warm up while he walked to clock in); ECF No. 848 at 117:11-24 (Genaro Moreno testifying that the dairy required him to perform the checks at both the end of the day and, for unstated reasons, again at the beginning of the following day apparently on the same vehicle); ECF No. 848 at 90:11-92:4 (Guadalupe Adame initially testifying that he checked the oil at the end of the day while on the clock *and* again at the beginning of the day on the same vehicle but then reversing his testimony to state he checked the oil only at the beginning of the day); ECF No. 842 at 50:24-57:11 (Victor Licona providing lengthy and evasive testimony that he rode with approximately four or five coworkers and initially testifying that only the driver performed the maintenance check but then reversing his testimony to state that he performed the check regardless of whether he was driving or riding, then repeatedly insisting that all passengers performed what appeared to be identical maintenance checks on the same vehicle and day).

[45] *See* ECF No. 845 at 125:11-126:2; ECF No. 849 at 236:25-237:5.

[46] *See* ECF No. 849 at 239:14-240:5.

because employees were simply not performing the maintenance checks or filling out the forms.[47]  Finally, the herd manager testified that only employees operating diesel equipment performed any significant maintenance inspections, which had to be done at the end of the day while still on the clock to ensure diesel mechanics were still working in case of any issues.  However, all gasoline operated vehicles, including those provided to claimants for transportation, were maintained and checked by a mechanic hired exclusively for that purpose and employees checked only for minor items such as flat tires and broken windshield wipers, and were required to simply defrost the windshield during winter.[48]

In sum, based on the unique facts of this case, the commuting time between the parking lot and timeclock does not constitute compensable working time under Washington law.[49]  Although a handful of dairy employees apparently were asked on occasion to perform minor inspections relating to vehicles provided for the employees' collective commuting convenience, the record does not support imposing liability on the dairy for the reasons detailed above.  Therefore, the debtors' objections to the travel and wait time claims are sustained.

---

[47]  *See* ECF No. 845 at 126:3-11; ECF No. 849 at 237:9-20.

[48]  *See* ECF No. 849 at 235:3-236:24.

[49]  Claimants Alberto Flores, Jorge Ramirez, and Raul Vasquez testified that, during their time as shift leads in the milking department, they often drove a bus transporting milking employees between the parking lot and the milk barn at the beginning and end of shifts.  *See* ECF Nos. 849 at 13:14-16, 110:22-24; 850 at 53:17-19.  There is no specific claim for damages for these activities and only one reference to performing such activity in claimants' post-hearing briefing.  *See* ECF No. 851 at 43:1-3.  Thus, it is unclear whether claimants assert this as a distinct basis for damages.  If so, the court finds that damages are not warranted for the following reasons.  First, as discussed in more detail below, any such assertion would be based on (i) claimants' general assertion that milking employees fully earned their shift rate upon working eight hours, thus, (ii) the corollary that they are entitled to additional pay for any time over eight hours, and (iii) the unstated (and unsupported) premise that the bus driving took place outside the eight hours.  As detailed more fully below, the court rejects claimants' construction of their shift rate agreement.  *See* pp. 71-74 *infra*.  Further, the dairy paid shift leads a shift rate higher than regular milking employees to compensate them for additional responsibilities associated with the title.  The record indicates that this broader scope included transporting milkers via bus.  No claimants allege otherwise.  So, to the extent any claimant contends that he or she was "on duty" as a result of driving the bus turning the travel time into "hours worked," such claimant already received the agreed upon compensation via his or her higher compensation as a shift lead and is not entitled to additional pay.  Thus, damages are not warranted.  Even if the court were to find otherwise, claimants have provided insufficient information on which to calculate damages.  No claimant in particular specifically asserts this as a distinct theory of liability, and claimants appear to lump whatever damages might be attributable to bus driving under either or both the nonspecific terms "pre-shift work" and "post-shift work."  *See, e.g.*, ECF No. 852 at 7:16-17, 21:18-19, 29:15-16.  Thus, the court is unable to determine whether claimants specifically seek damages on this distinct basis and, if so, the amount they claim.

**MEMORANDUM DECISION**          Page 12

*Rest Breaks*

Claimants contend that debtors are liable for damages in the form of wages based on the debtors' alleged failure to provide rest breaks compliant with Washington Administrative Code ("WAC") 296-131-020(2). This regulation provides that: "Every employee shall be allowed a rest period of at least ten minutes, on the employer's time, in each four-hour period of employment." Washington courts have emphasized that "employers must affirmatively promote meaningful break time" and pay employees for breaks.[50] Claimants do not contend that they received unpaid rest breaks, but instead assert that they received no rest breaks at all. In turn, they contend that these alleged violations entitle them to wages equal to the time for the allegedly missed rest breaks. The debtors do not contest the applicability of the regulation or that it could give rise to liability and damages as claimants propose. The debtors do, however, contend that they complied with the regulation and therefore are not liable for such damages. At the outset, it is worth noting that the dairy did not prescribe set times for rest breaks. Rather, the dairy advised employees in writing at the outset of employment that employees were allowed rest breaks "to be taken at the discretion of the employee."[51] Yet the regulation at issue here contains no requirement that an employer prescribe specific rest-break times. This is telling since a similar regulation governing rest breaks for nonagricultural workers does address the matter.[52] Thus, canons of construction require one to attribute intent to the omission. Such a construction is particularly strong here since the rest-break regulations governing agricultural workers were patterned on those governing their nonagricultural counterparts.[53]

Based on the facts detailed below, the court finds that the evidence does not support the claimants' rest-break claims for a variety of reasons.[54] As a general matter, there are a panoply of credibility issues the court addresses below while discussing the details of individual testimony.

---

[50] *See Lopez Demetrio v. Sakuma Bros. Farms*, 183 Wash. 2d 649, 655-56, 658 (2015).

[51] *See, e.g.*, Ex. 6 at 2 (Employment Agreement for Outside Employees); Ex. 14 at 2-3 (Employment Agreement for Milkers); *see also* ECF No. 849 at 212:3-6 (herd manager testifying that there was no designated time for rest breaks but the dairy's policy was "when you need a rest, go rest").

[52] *See* WAC 296-126-092(4), (5).

[53] *See Lopez Demetrio*, 183 Wash. 2d at 656.

[54] The primary evidence is each claimant's testimony as the dairy did not require employees to document their rest breaks during the bulk of the claims period. *See, e.g.*, ECF No. 845 at 6-24 (herd manager testifying to the same).

**MEMORANDUM DECISION**       Page 13

More specifically, many, if not most, claimants failed to testify that the dairy denied, or even discouraged, them from taking rest breaks and, therefore, was to blame for any allegedly missed rest breaks. Many, if not most, claimants also testified that they actually did receive informal rest breaks on an as needed basis without any interference from the dairy or its personnel – which is consistent with the dairy owner's stated personal policy regarding rest breaks as well as his daughter's general experience while working at the dairy during the claims period and later as the herd manager.[55] Further, in the absence of regularly scheduled rest breaks, it is difficult to believe that employees could forgo rest breaks entirely given the physically laborious nature of the work and the scorching climate in the region during a large portion of the year.[56]

Significantly, claimants' common failure to attribute missed rest breaks to dairy actions, common testimony that they actually received informal downtime, along with other common factors that witnesses articulated exposed a common misconception among claimants (and possibly their counsel) that rest breaks need be formally scheduled or announced to comply with the rest break provision in WAC 296-131-020(2). In some instances, claimants explicitly proclaimed that a supervisor needed to formally relieve an employee of duties for them to consider downtime as a rest break. In several other instances, this premise was implicit in the testimony. This misconception explains the sincerity of many claimants' testimony insisting they missed rest breaks while (i) failing to also allege that the dairy denied or discouraged such breaks and (ii) readily conceding that they could, and did, receive periodic rest breaks on an informal basis. It is also consistent with the necessity for employees to take informal rest breaks individually, rather than as a group, in the milking department to ensure the milking line runs uninterrupted.[57] This misapprehension is further highlighted by claimants conceding that they received rest breaks after the dairy adopted a new policy imposing specific rest break times towards the end of the claims period. Claimants hold this clarification of company policy out as evidence that the dairy denied rest breaks before the

---

[55] *See* ECF No. 845 at 99:4-100:15, 103:3-7 (Arthur Mensonides testified that, since he started the dairy and through the claims period, employees could take rest breaks as needed with no restriction and that when employees "need a break . . . [t]hey take a break"); *id.* at 108:23-111:10 (herd manager testifying that, as a milking employee, she took regular rest breaks with her coworkers who would all bring food items to share and, likewise, would have coffee with her coworkers during regular rest breaks when she worked in the hospital); *id.* at 115:3-17 (herd manager testifying that "for rest breaks, it was whenever you felt that you needed to take a break, you took a break" and conceding that she needed rest breaks and meal periods to remain productive).

[56] *See* ECF No. 845 at 160:21-161:4 (herd manager expressing doubt that workers could perform such "intensive labor" for "the amount of hours and not tak[e] any breaks" and emphasizing "it's hard work").

[57] *See* ECF No. 845 at 138:13-18; ECF No. 849 at 215:16-17, 216:23-24.

**MEMORANDUM DECISION**     Page 14

policy change. However, this evidence does not do the work claimants hope. More logically, the dairy removed its employees' prior privileges to take rest breaks at their discretion and replaced that freedom with a set schedule to avoid future litigation about the matter.[58]

Finally, none of the claimants offered any method to reliably determine the frequency or duration of the informal rest breaks they received and thus to quantify with ***any*** degree of certainty the number of breaks not received. Thus, as many of the claimants acknowledged on cross examination, the court would necessarily have to engage in pure speculation to first assess liability against the dairy for allegedly missed rest breaks and then again wade into conjecture to manufacture a damages number. The court is not willing to engage in such machinations – especially since there is no credible evidence that the dairy systematically denied or discouraged rest breaks – and in fact cannot award damages based on such a record under Washington law. With these considerations in mind, the court turns to the testimony of each claimant.

**Adan de la Mora**: On direct examination, Mr. De la Mora initially confirmed that he "receive[d] at least ten minutes of rest break for every four-hour period of work." *See* ECF No. 846 at 102:14-17. Mr. De la Mora then reversed this testimony in response to his counsel's leading questions and claimed that he was referring to missing meal periods, not rest breaks. *See id.* at 102:20-103:5. However, this testimony creates another conflict because the testimony Mr. De la Mora stated was mistakenly in reference to meal periods conflicted with his testimony provided just shortly before directed at meal periods. *Compare id.* at 102:20-21 (testifying that "the lunch break was 15 minutes"), *with id.* at 98:22-99:3 (testifying that he received "one hour" meal periods but sometimes as little as "20 minutes"). Mr. De la Mora also conceded that he never attempted to take a rest break. *See id.* at 103:11-19. When asked why he made no attempt to take rest breaks, Mr. De la Mora confusingly replied "[b]ecause it was just half an hour and we were already -- you know, had clocked out for that." *See id.* at 103:10-19. On cross examination, Mr. de la Mora admitted that he worked alone all day every day. *See id.* at 109:8-12, 114:4-5. He also conceded that he was able to, and did, stop work to drink water when needed without interference. *See id.* at 114:11-15.

---

[58]   As debtors' counsel noted during closing argument, one could reasonably ask whether the shift to a more paternalistic system regarding when breaks are taken, monitored, and recorded is actually in the employees' interests. This ultimately is a policy issue that is beyond the scope of the court's inquiry.

**MEMORANDUM DECISION**                   Page 15

The court gives no weight to Mr. De la Mora's testimony that he received no rest breaks. As an initial matter, Mr. De la Mora did not testify or indicate that any person of authority, or even a coworker, advised that he could never take rest breaks. Without this important factor, there is no evidence that the dairy should be held liable for any allegedly missed rest breaks. Further, any allegation that the dairy denied or discouraged him from taking rest breaks would lack credibility since Mr. De la Mora conceded he worked alone throughout the day with no one to monitor his rest breaks. Finally, Mr. De la Mora readily conceded that he took informal breaks on an as needed basis throughout the workday to rehydrate. Common among many of the claimants, it appears Mr. De la Mora believes that down time must be formally announced to count as a rest break.

**Alberto Flores**: On direct examination, Mr. Flores testified that rest breaks were not permitted at the dairy. *See* ECF No. 850 at 57:20-21. He also testified that he never attempted to take rest breaks because the "boss . . . wouldn't like it" and "would go in the office . . . move his head, and just kept staring at us . . . tell something to the supervisor, and then he would tell who was outside." *Id.* at 58:10-15. Mr. Flores did not identify the "boss" in question or state that anyone specific at the dairy discouraged or prohibited rest breaks. On cross examination, Mr. Flores testified that the "boss" typically expressed the headshaking disapproval in the morning when a worker stepped away from the milking line to grab a piece of fruit. *See id.* at 93:6-20. However, Mr. Flores did concede that he and his coworkers were able to step away from the milking line to heat up food or use the restroom without interference. *See id.* at 94:25-95:7, 96:2-7. He also conceded that he often witnessed other coworkers regularly stop working to take a break without any apparent consequences. *See id.* at 95:24-95:1. Finally, Mr. Flores conceded that he had no way to determine the duration or frequency of the times he or others stepped away from work for personal reasons. *See id.* at 94:13-16, 95:8-24.

Although Mr. Flores initially testified that the dairy did not permit rest breaks, he did not identify the source of the prohibition. The only support for the statement is that Mr. Flores perceived some form of disapproval from an unidentified "boss" when employees would take rest breaks. If Mr. Flores subjectively connected the purported disapproval to the taking of a rest break, this necessarily means that Mr. Flores witnessed coworkers taking these breaks, which is contrary to Mr. Flores' testimony that rest breaks were not permitted. Based on Mr. Flores' testimony, it seems more logical to construe the unidentified authority figure's disapproval as directed at rest breaks of excessive frequency or duration. Further, Mr. Flores testified that he actually did step away from work to attend to personal matters but

had no way to calculate how often or how long. Thus, trying to determine the number of missed rest breaks, if any, is a wholly speculative endeavor.

**Alfredo Sanchez**: On direct examination, Mr. Sanchez testified that he received no rest breaks at all because "[t]hey were going to bring it to our attention." ECF No. 842 at 117:9-18. Mr. Sanchez did not elaborate on just how "they" would "bring it to his attention" or specifically identify or otherwise indicate the status of the individuals he referred to as "they." On cross examination, Mr. Sanchez conceded that he worked alone when he worked both day and night shifts. *See id.* at 127:16-24, 128:10-13. He also conceded that "there were time when it was slower" during his shifts. *See id.* at 129:1-6.

The court finds Mr. Sanchez's testimony unreliable generally and related to rest breaks specifically. First, in relation to rest breaks, Mr. Sanchez's nonspecific testimony regarding unidentified persons who acted in vague manners does not amount to an allegation that the dairy denied him, or even discouraged, rest breaks. Rather, it appears to be an attempt to imply such facts without committing to them. Further, his testimony that these unidentified individuals were able to observe his rest break habits is inconsistent with his later testimony that he worked alone. Second, these inconsistencies are of a character observed during Mr. Sanchez's testimony generally. In relation to Mr. Sanchez's meal period claims, he provided similarly unreliable testimony. He alleged highly specific facts related to the amount of time he clocked out for meal periods that conflicted with the times actually recorded on his timecards. He also grossly overstated the number of calves born during his shift, to inflate his workload apparently to demonstrate his inability to take meal periods. The court has detailed this lack of credibility below[59] and incorporates that reasoning in relation to its general credibility determination.

**Ana Cruz**: On direct examination, Ms. Cruz testified that she never received rest breaks at all and that when she tried to take a break her foreman "told [her] that [she] couldn't take it . . . [b]ecause there was a lot of work to be done" – i.e., he simply said "that we don't get breaks." ECF No. 847 at 17:14-18:2. However, Ms. Cruz also inconsistently testified that the foreman stated "you're allowed one" rest break. *See id.* at 19:1-3. On cross examination, Ms. Cruz conceded that her memory regarding rest breaks could be no better than her memory regarding meal periods. *Id.* at 24:2-4. In that regard, Ms. Cruz testified that she never received meal periods of over thirty minutes but that her timecards would be more reliable.

---

[59] *See* pp. 42-43 *infra* (discussion regarding Mr. Sanchez's meal period claim).

*Id.* at 23:16-24:1. The timecards, however, show the overwhelming majority of her meal periods exceeded one hour, a significant number approached two hours, and others exceeded two. *See* Ex. 23. Thus, Ms. Cruz's memory regarding meal periods diverged significantly from the timecards. Again, Ms. Cruz conceded that her memory could be equally faulty as to rest breaks. *See id.* at 24:5-7. She did testify that she was able to stop work to retrieve water when thirsty, to have a personal conversation, to use the restroom, and to take a breather as the work allowed. *See id.* at 25:25-27:21. Most importantly, Ms. Cruz testified that "[f]or me, a break is for them to tell me, you know 'Have a seat and take your ten minutes.'" *Id.* at 25:20-21.

While the court found no reason to doubt the sincerity of Ms. Cruz's testimony, it fails to support her rest break claim. She testified that her foreman generally prohibited rest breaks while also testifying that the foreman allowed at least one rest break. Ms. Cruz did not reconcile this inconsistency and the court is unable to do so. Her testimony also revealed an understandable inability to accurately recall important details from the claims period. More significantly, Ms. Cruz testified that she could, and did, take informal rest breaks as needed without interference. Most importantly, Ms. Cruz explicitly testified that she believes a compliant rest break requires some sort of formality. Therefore, any testimony that Ms. Cruz failed to receive rest breaks fits with this definitional belief and fails to account for the informal rest breaks she did receive.

**Antonio Licona**: On direct examination, Mr. Licona testified that he never received rest breaks "[b]ecause we already knew that there weren't any breaks" and he understood "it was always that way." ECF No. 848 at 27:25-28:10. Mr. Licona did not allege that a coworker or a superior advised him that rest breaks were not permitted or otherwise identify a source of the alleged prohibition. On cross examination, Mr. Licona testified that he was able to stop working to use the restroom without interference. *See id.* at 45:4-7. Mr. Licona gave conflicting testimony about his ability to take phone calls – first he testified that he was "not allowed" to use the telephone but also conceded that he took calls from his spouse while at work. *See id.* at 45:19-20, 46:20-47:19. Mr. Licona did not testify that anyone advised him that phone use was prohibited.

As with other claimants, the court finds that Mr. Licona's testimony fails to support his rest break claim. His generalized testimony about not receiving breaks simply because "there weren't any" and that "it was always that way" without more specifics does not amount to an allegation that the dairy denied him, or even discouraged, rest breaks and specifically conflicts with the dairy's written policy.

Further, Mr. Licona conceded that he was able to, and did, take informal rest breaks of unknown duration and frequency without interference.

**Armando Madero**:  Mr. Madero testified that he doesn't recall taking any rest breaks during the first two weeks of his employment, then taking only one per day thereafter.  *See* ECF No. 849 at 68:5-11.  Mr. Madero did not testify about the reasons for the allegedly missed rest breaks.  Mr. Madero also answered "yes" to his counsel's leading question about whether Mr. Madero was instructed to use the restroom during his rest breaks[60] and he also testified that he received the instruction on his first day of employment.  *See id.* at 68:16-23.  The court finds Mr. Madero's testimony problematic for a variety of reasons.

First, if Mr. Madero received instructions at the outset of his employment to use the restroom during rest breaks, then this testimony necessarily reveals that the dairy advised him of his ability to take rest breaks at that time and discredits any memory Mr. Madero had regarding his lack of rest breaks during his first two weeks of employment.  Either Mr. Madero failed to accurately recall taking rest breaks (possibly due to their informality) or failed to recall the basis for the allegedly missed rest breaks (possibly because he incorrectly understood that rest breaks need to be a formal affair).  Second, his testimony contained several unexplained inconsistencies such as the one identified above.  Third, he seemed to readily recall exact details that aided his claims but could not recall others that did not.  *Compare, e.g.*, *id.* at 68:5-11 (recalling he received no breaks during his first two weeks of employment)*, with, e.g.*, *id.* at 84:10-12 (failing to remember whether he was ever late to work), *and id.* at 85:10-12 (not remembering whether his "pay was docked" for arriving late to work).  Fourth, Mr. Madero conceded that the period at issue "was a long time ago," causing difficulty recalling certain details.  *See id.* at 92:11-14.  Fifth, on cross examination he gave a lengthy series of evasive, circular, nonresponsive, and self-serving answers to questioning when debtors' counsel attempted to reconcile several inconsistencies within Mr. Madero's trial testimony and between it and Mr. Madero's deposition testimony.  *See id.* 87:22-4, 88:23-89:13, 90:4-91:9.  The court eventually stopped the line of questioning when it recognized the futility of counsel's efforts to get responsive answers from Mr. Madero.  *See id.* at 91:10-11.  For these reasons, the court finds Mr. Madero's testimony unreliable as it relates to the rest break claims.

---

[60]  Claimants' counsel asserts that L&I has a policy reflecting the agency's position that employers should not limit restroom use to rest breaks.  *See, e.g.*, ECF No. 851 at 28:8-12.  However, counsel does not explain how this policy is binding, gives rise to any liability or damages, or is otherwise relevant here.  Either way, Amy Mensonides credibly testified that the dairy does not restrict restroom use.  *See* ECF No. 845 at 68:12-14.

**Candelario Herrera**: On direct examination, Mr. Herrera testified that he received no rest breaks of at least ten minutes during the claims period. *See* ECF No. 842 at 93:15-21. Mr. Herrera did not testify about the reason for the allegedly missed rest breaks. However, in response to his counsel asking, "what was your understanding as to what would happen if you took a ten-minute rest break?," Mr. Herrera responded "[w]ell, I don't know." *See id.* at 94:3-6. On cross examination, Mr. Herrera testified that there was nothing about the nature of his work that prevented him from stopping to take a rest break. *See id.* at 103:15-19, 104:9-17. Mr. Herrera also gave inconsistent testimony about taking time to hydrate, including by making excessive efforts to deny he stopped working to drink or even replenish his water supply. More specifically, he initially testified that he drank water "always" throughout his eleven-hour workday. *See id.* at 105:1-4. Yet he denied stopping work to retrieve water from his truck, saying he took the water he needed for the day and "[t]hat I recall, I never ran out." *See id.* at 104:5-15. He then indicated that he took only three to four water bottles of approximately twelve ounces but "had them in the truck" rather than carrying them on his person, then reversed his testimony, and then finally admitted that he stopped work to retrieve water from his truck. *See id.* at 105:16-106:4. Mr. Herrera conceded that he was never reprimanded for these activities, but at the same time denied he ever took rest breaks while employed at the dairy. *See id.* at 105:5-12. Mr. Herrera conceded he had no way to verify the frequency or duration of the instances he stopped to get water. *See id.* at 107:20-25. He finally conceded that he could "fetch" water whenever he felt thirsty without hesitation. *See id.* at 108:1-10. He also volunteered that he worked alone, indicating there was no one around to prevent or diminish his rest breaks. *See id.* at 108:11-14.

**Ezekiel Balderema**: On direct examination, Mr. Balderama testified that, while working in the calving department of the dairy, he "would take . . . ten minutes in the morning to drink coffee" after performing his morning work duties but prior to his meal period on days he started at 5:00 a.m. (but not on days he started at 6:30 a.m.). *See* ECF No. 846 at 48:4-7, 51:5-7, 56:22-57:4. He also testified he did not receive an afternoon rest break in this department and that he never attempted to take a second break because "it was not permitted" according to "the laws of the -- from the dairy" and that his supervisor would reprimand him for taking a second break. *See id.* at 57:5-8, 58:6-23. Mr. Balderama also testified that "there were no breaks" during his time in the machinery department, either morning or afternoon, and that he would be reprimanded for attempting to take breaks. *See id.* at 52:18-22, 57:25-58:5, 58:24-59:4. Mr. Balderama did not identify any formal or informal dairy rules prohibiting rest breaks, allege that his supervisor or any other person informed Mr. Balderama of such a prohibition, or testify that he suffered or

witnessed a reprimand for taking rest breaks. On cross examination, Mr. Balderama testified that, while working in the calving department, he came in at 5:00 a.m. during summer because he "wanted to go in a bit earlier" due to the weather changes, apparently leaving him no time for breakfast prior to work "[s]o that is the reason" for the midmorning ten-minute rest breaks on the days he started working earlier. *See id.* at 73:17-25. Inconsistently, Mr. Balderama then testified that "they would tell us . . . [t]he supervisors would tell us" that "it wasn't permitted to take a break when [he] started at 6:00." *See id.* at 73:1-9. Mr. Balderama did not identify the supervisors at issue or explain why rest breaks would be allowed when one started at 5:00 a.m. but not 6:00 a.m. While employed in the machinery department, Mr. Balderama testified that he worked only "occasionally" in the same area as his supervisor for only five to seven minutes at a time but not often for a full day and that he sometimes worked entirely alone. *See id.* at 84:8-12, 88:3-4. Even more inconsistently, Mr. Balderama testified that "[i]f [h]e would take [a rest break] [h]e would get yelled at" even on days he worked unsupervised. *See id.* at 90:11. When the debtors' counsel sought an explanation, Mr. Balderama altered his testimony to stated that his heavy workload precluded rest breaks – counsel's further efforts resulted in a lengthy and confusing nonexplanation. *See id.* at 90:13-91:6. Due to the several unexplained inconsistencies, the court finds that Mr. Balderama's testimony lacks credibility.

**Genaro Moreno**: Mr. Moreno testified that he "wasn't given any breaks." ECF No. 848 at 107:9-10, 113:10-19. He also testified that, during the last year of his employment, the dairy required him to log rest breaks and sign a paper confirming he received rest breaks between 9:00-9:10 a.m. and 3:00-3:10 p.m. each day, but that his supervisor would not allow Mr. Moreno to actually take the logged rest breaks. *See id.* at 107:18-108:5, 114:6-17. On cross examination, Mr. Moreno continuously testified that the same supervisor he identified on direct forced Mr. Moreno to record rest breaks but prohibited Mr. Moreno from actually taking the rest breaks; however, Mr. Moreno eventually conceded that the supervisor "didn't tell us anything about breaks at all" but that the supervisor simply "never told us . . . never told us that we could go and take a break." *See id.* at 119:15-21, 120:8-12. Significantly, Mr. Moreno further altered his testimony to say that the supervisor at issue did not instruct him to log rest breaks at all but conversations about recording the rest breaks occurred with a separate individual. *See id.* at 119:23-120:7. When debtors' counsel showed Mr. Moreno his sworn declaration made in preparation for trial where Mr. Moreno clearly conceded that he received the logged rest breaks, Mr. Moreno initially avoided addressing the inconsistency or his declaration at all and insisted that the dairy would terminate him for refusing to sign the dairy's form confirming he took the rest breaks. *See id.* at 130:16-22.

Upon further questioning, Mr. Moreno gave extremely confusing testimony, conceded that nothing specific had changed his mind since the declaration, and ultimately he could not reconcile the contradiction even in his own mind admitting that "I know I don't understand that" in response to a request to explain the contradiction. *See id.* at 130:24-132:2. Later in his testimony related to a separate topic, Mr. Moreno volunteered that "throughout the day . . . I was almost always alone" and that his supervisor "would just call me, you know, to make changes, you know, about the work," and that "[a]t the beginning of the day, he would give me orders, and then throughout the day, it was very rare, you know, to go meet up with him again." *See id.* at 137:21-138:19.

Mr. Moreno's testimony is not credible. While alleging his supervisor denied him any rest breaks Mr. Moreno failed to explain how the supervisor did so while absent. He also failed to reconcile inconsistencies within his testimony and between it and his prior sworn statements. Finally, Mr. Moreno revealed that his allegation of missed rest breaks is based on his incorrect premise that such breaks require some sort of formality, as well as that he did receive some rest breaks on an informal basis. Lastly, Mr. Moreno provided no way to calculate the number of rest breaks he allegedly missed.

**Guadalupe Martinez Adame**: On direct examination Mr. Adame denied that he ever received ten-minute rest breaks in each four-hour period. *See* ECF No. 848 at 73:13-19. Mr. Adame did not provide an explanation for why he allegedly missed his rest breaks. On cross examination, Mr. Adame testified that the work kept him busy but nothing about the work itself prevented him from taking a rest break, yet repeatedly insisted that he could not do so without explanation. *See id.* at 79:11-80:13. He finally admitted that he did not do so because he "was never told you gotta take such and such minutes in the middle of your work . . . [i]t was just not right to do that." *See id.* at 80:16-24. Finally, Mr. Adame conceded that he had no idea how many rest breaks he did or did not receive. *See id.* at 85:9-13. Again, it appears that Mr. Adame's allegations of missed rest breaks are based on the faulty premise that rest breaks need be a formal affair as evidenced by his explicit statements and his concessions that he took informal rest breaks for which he fails to account. Further, Mr. Adame presented no evidence on which to calculate the duration or frequency of the rest periods he did receive.

**Hector Ibanez**: On direct examination Mr. Ibanez testified that he never received ten-minute rest breaks in each four-hour period "because they didn't give any" and that he "didn't do it because no one else would do it." ECF No. 846 at 13:3-14. Mr. Ibanez did not allege that the dairy or its supervisors discouraged or prohibited

the practice. On cross examination, Mr. Ibanez conceded that he left the milking line to eat, drink, or use the restroom without clocking out and that he could also leave to make personal calls if needed. *See id.* at 20:17-24, 21:8-10, 28:13-24. He also conceded that he had no records and could not remember the instances when he stopped working to take rest breaks and agreed that there is "no way" of knowing. *See id.* 20:25-21:1, 29:4-30:2. On recross, Mr. Ibanez estimated his rest breaks lasted "around five minutes only" but not as many as ten. *See id.* at 33:23-34:2. Mr. Ibanez also testified that there were no scheduled rest break times but "[o]nly when I had thirst, I go to drink water" and "[w]hen I want to go to the restroom, I would go." *See id.* at 34:10-16. Further, while denying the job allowed for rest breaks, Mr. Ibanez acknowledged that he "would tell the foreman that I'm going to the restroom" and the foreman "would say, 'Okay, go' . . . just like that." *See id.* at 34:17-22.

Mr. Ibanez appears to suffer from the common misconception that only formally scheduled or announced rest breaks count toward the rest break requirement. He initially and adamantly denied he took any rest breaks while conceding later that he could apparently do so at will. Thus, the court finds his testimony not credible. This lack of credibility is exacerbated by Mr. Ibanez's similarly inconsistent testimony related to meal periods when he categorically denied on direct that he received any meal periods only to provide starkly contradictory testimony on cross examination.[61] For all these reasons, the court gives no weight to Mr. Ibanez's testimony.

**Jesus Gallegos**: On direct examination Mr. Gallegos testified that he never received ten-minute rest breaks in each four-hour period during his time as a milking employee and only once or twice a week when he worked as an outside employee in the maternity and hospital departments. *See* ECF No. 844 at 85:5-19, 86:3-8. Mr. Gallegos testified that he received these ten-minute rest breaks in the maternity department "[w]hen the foreman [sic] were in a good mood" and the foreman "would say, you know, 'Take a break.'" *See id.* at 85:16-23. Mr. Gallegos did not specifically testify that his foreman denied rest breaks in the maternity department. Though Mr. Gallegos conceded he received some rest breaks in the hospital department, he then testified that during his time there "they were always upset . . . and they didn't allow us to take a break." *See id.* at 86:9-11. Although referring to "they," Mr. Gallegos identified only one individual who he alleged denied him rest breaks. *See id.* at 86:13-16. On cross examination, Mr.

---

[61] *See* pp. 53-54 *infra* (discussion regarding Mr. Ibanez's meal period claim).

**MEMORANDUM DECISION** Page 23

Gallegos conceded that he had no way to determine the frequency or duration of the rest periods he admittedly received.  *See id.* at 93:15-94:9.

The court gives no weight to Mr. Gallegos' testimony related to rest breaks.  First, it is apparent that he deems periods as compliant rest breaks only when a superior formally relieves him of duty as evident from his testimony about his time in the maternity department.  Because of this, it is likely he received many informal rest breaks he excluded from his calculation.  Second, Mr. Gallegos provided no way to estimate the number of rest breaks he missed as a consequence of the dairy's alleged violations.  Thus, any damage award would be speculative.  Finally, the court finds that Mr. Gallegos' testimony generally lacks credibility.  As discussed below, Mr. Gallegos provided testimony in relation to his meal period claim that lacked plausibility on its own but became even less plausible when contrasted with other evidence such as his timecards and the testimony of other claimants.[62]  The general credibility of Mr. Gallegos' trial testimony is further undermined by conflicts debtors' counsel exposed between Mr. Gallegos' deposition testimony and trial testimony that Mr. Gallegos could not explain satisfactorily.  In relation to one of his other claims, Mr. Gallegos gave evasive answers to questions on cross examination ultimately indicating that the dairy required him to stay on premises after work for an indeterminate amount of time until transported off premises via company vehicle.  *See id.* at 95:14-97:4.  However, as debtors' counsel pointed out to Mr. Gallegos at trial, during his deposition Mr. Gallegos testified that he could leave the dairy's premises by foot after work and chose to take the dairy's transportation for his own convenience.  *See id.* at 97:5-98:17.  Mr. Gallegos reviewed the deposition transcript and conceded that he had so testified yet, at trial, maintained the conflicting position that favored his claims.  *See id.* at 98:18-99:2.

**Joaquin Mendoza**:  On direct examination Mr. Mendoza categorically denied that he received ten-minute rest breaks at all during the claims period but, confusingly, instantly conceded that he received ten-minute rest breaks in the mornings while he was working in the hospital department.  *See* ECF No. 844 at 15:6-18.  Mr. Mendoza did not provide any reason for the allegedly missed rest breaks.  However, on cross examination, when avoiding answering an unrelated question, Mr. Mendoza also conceded that "[t]here in the milking . . . they would at least give us, you know, a break and the lunch."  *See id.* at 27:5-7.  Significantly, when debtors' counsel asked, "Everybody would stop to take a breather; isn't that right?," Mr. Mendoza responded "[e]xactly."  *See id.* at 30:7-9.  In response to counsel's questions about whether Mr. Mendoza and his coworkers took informal

---

[62]  *See* pp. 54-56 *infra* (discussion regarding Mr. Gallegos' meal period claim).

breaks while watching for supervisors to avoid detection, Mr. Mendoza gave lengthy and nonresponsive answers primarily related to the difficulty of his employment with the dairy and its supervisors. *See id.* at 31:10-32:25. After giving indirect responses, Mr. Mendoza finally conceded that he had no records or other way of knowing the duration or frequency of the informal rest breaks he did receive. *See id.* at 36:2-16, 37:14-25. On redirect, Mr. Mendoza testified that his supervisor "counted when you would go to the restroom, or we would pick up the phone to answer some -- some questions if it was an emergency or something." *See id.* at 38:15-20. On recross, Mr. Mendoza conceded that he stopped working to rest for indeterminate periods of time several times a day due to the physically demanding nature of the work. *See id.* at 40:15-41:17. He also conceded that he didn't work in the same area as his supervisor and encountered the supervisor only "periodically" throughout the workday. *See id.* at 41:18-23.

Again, the court gives little to no weight to Mr. Mendoza's testimony. It is impossible to determine which of Mr. Mendoza's statements are true. He initially gave a blanket statement that he received no rest breaks at all. Crucially, he did not allege that the dairy was at fault for the allegedly missed rest breaks. As demonstrated above, Mr. Mendoza eventually identified more and more rest breaks he did actually receive, both formal and informal. Again, it seems Mr. Mendoza fails to account for rest breaks he did receive simply because he was not formally relieved of duty. Further, his testimony that his supervisor "counted" restroom breaks and telephone calls towards the allotted rest breaks make no sense if the supervisor denied all rest breaks altogether. Additionally, the supervisor's infrequent physical presence makes it difficult to give credence to any allegation that the supervisor actually prevented Mr. Mendoza from stopping for a rest break. And, contrary to such a notion, Mr. Mendoza testified that he was able to take informal rest breaks as needed without interference. Mr. Mendoza's credibility is also generally undermined by similarly inconsistent testimony related to his meal period claims where he testified that he received no meal periods during any of his employment but, again, reversed himself and then even conceded that the dairy required him to take meal periods. *See id.* at 19:19-24, 21:9-17. Finally, Mr. Mendoza did not provide any method for identifying the rest breaks he allegedly did not receive. Because of the testimony's several, significant, and irreconcilable inconsistencies, and the necessity to speculate, the court cannot award any damages based on the allegations therein.

**Jorge Ramirez**: Mr. Ramirez testified on direct examination that he did not receive rest breaks during the claims period. *See* ECF No. 849 at 122:12-23, 130:24-131:20. On cross examination, Mr. Ramirez testified that the dairy

changed its rest-break policy after the claims period requiring employees to take rest breaks at nine and three but made no changes to the job duties to accommodate for the time. *See id.* at 160:23-161:18. When debtors' counsel asked why Mr. Ramirez could not take a rest break before the policy change, Mr. Ramirez stated that he didn't take rest breaks because "we were never told [to do so]." *See id.* at 168:7-18; *see also* 162:7-9, 167:13-14, 168:14-18. At the same time, Mr. Ramirez acknowledged that the dairy informed him in writing of his rest break rights and advised him to take the rest breaks at his discretion; he also acknowledged that the dairy allowed and expected him to take informal rest breaks. *See id.* at 162:15-18. Finally, Mr. Ramirez testified that he considered the dairy to start giving rest breaks after its policy change because "they told us [to take rest breaks]." *See id.* at 162:13-14. This testimony indicates not that the dairy began providing rest breaks after the claims period, but that it imposed formal rest breaks at specific times throughout the day. Further, the testimony reveals that Mr. Ramirez does not understand a rest break to be compliant unless he is formally relieved of duty. Mr. Ramirez's understanding is not supported by any binding or persuasive authority. Significantly, Mr. Ramirez testified that he had no way of determining the duration and frequency of the periods he stopped working outside of formal rest breaks. *See id.* at 177:3-9.

**Jorge Ramos**:[63] During his deposition, Mr. Ramos testified that he worked as a milking employee during his entire tenure at the dairy, ultimately as a shift supervisor. *See* Ex. 55 at 11:4-12:20. Mr. Ramos did not testify that rest breaks were prohibited at the dairy but indicated that the workload made it difficult to take them. *See, e.g., id.* at 23:20-24, 27:5-8. He also denied that he "ever received documents from the company . . . explaining policies with regards to breaks or lunches." *See id.* at 55:8-11. Similar to other claimants, Mr. Ramos' testimony revealed that he understood that breaks require some sort of formal relief from duty to count as rest breaks. *See, e.g., id.* at 26:2-3 ("But, you know, in regards to breaks, I mean we were never told to take either that 10-minute break"); 25:18-20 ("[T]hat was never a policy where I was told that we could . . . take a break"). Further, Mr. Ramos appeared to assert he had no authority to provide rest breaks to his milking employees because his supervisors never explicitly instructed him to do so. *See, e.g., id.* at 24:10-15, 26:25-27:4. However, in contrast to this testimony, Mr. Ramos also testified that another employee at the dairy advised him that he should allow only one rest break to milking employees after the dairy changed its policy in 2017 to ensure milking employees took two rest breaks per

---

[63]  Mr. Ramos could not attend the evidentiary hearing due to illness. As such, debtors' counsel consented to proceeding on Mr. Ramos' claims via his deposition testimony. *See* ECF No. 842 at 4:4-25.

day. *See, e.g.*, *id.* at 24:18-24, 35:21-36:18. Mr. Ramos did not reconcile this later testimony which implicitly reflected his authority to ensure employees took rest breaks with his initial testimony that he lacked such authority. Also, while Mr. Ramos identified the employee by name, Mr. Ramos did not allege that the employee had any authority over Mr. Ramos. Mr. Ramos initially denied recalling any adverse actions taken against employees who took rest break but later testified that he witnessed a supervisor argue with an unidentified employee over taking a rest break – however, Mr. Ramos could not recall the name of the supervisor though he testified earlier that there were only four (one of which was the daughter of the dairy owner and another was apparently Mr. Ramos' wife). *See id.* at 23:6-11, 30:17-32:7; Ex. 56 at 10:5-13, 13:13-20. Significantly, Mr. Ramos testified that milking employees could, and did, leave the milking line to attend to personal matters such as making telephone calls or going to the restroom without interference but had no way of determining the frequency of these informal rest breaks. *See* Ex. 55 at 22:19-23:5, 23:15-19, 26:4-8, 27:9-25. He also testified that he and other employees received some downtime when the milking machines underwent their wash cycle. *See id.* at 29:4-12. Finally, Mr. Ramos conceded that his memory of the events and period in question may not be entirely accurate because "[i]t's been a while that all this happened." *See id.* at 10:6-9.

Mr. Ramos' testimony does not support his rest break claim. While he testified to his lack of authority to ascribe rest breaks and meal periods, this testimony conflicts with his wife's testimony who worked with Mr. Ramos and who testified that he did just that. *See* Ex. 56 at 30:25-31:6. Further, because two of Mr. Ramos' four supervisors were the dairy owner's daughter and ultimately Mr. Ramos' own wife, Mr. Ramos' inability to recall the identity of the supervisor who reprimanded the rest-break-taking employee calls into question Mr. Ramos' ability to accurately remember the events at issue (along with his admission that his memories are stale on the matter). In addition to credibility issues, Mr. Ramos' allegations related to the silence of some authority figure as to taking rest breaks reveals that his understanding suffers from the same fatal misconception as his fellow claimants – that is, employees need be formally relieved of duty for a break to count as a rest break. Further, Mr. Ramos did not identify who might instruct him to do so given that he was a shift supervisor. His misunderstanding is further revealed by his failure to allege that the dairy prohibited rest breaks and his consistent testimony that his employees received rest breaks of unstated duration and frequency on an informal basis without interference and never indicated that he was excluded from this privilege. Finally, he conceded he had no way to determine the number and length of any of these informal rest breaks rendering a damages calculation for missed rest breaks, if any, entirely speculative.

**MEMORANDUM DECISION**           Page 27

**Jose Esquivel**: Mr. Esquivel testified on direct examination that he did not receive any ten-minute rest breaks during the claims period because his supervisor would "bring it to our attention" and direct Mr. Esquivel to "get back to work." *See* ECF No. 844 at 57:8-58:22. On cross examination, Mr. Esquivel confusingly testified that he was regularly reprimanded for taking rest breaks while working. *See id.* at 64:22-24, 73:22-24. He also testified that he tried to take rest breaks two or three times during the dayshift by asking, "May I take my break?," but that his supervisor replied "no." *See id.* at 65:2-10. Mr. Esquivel testified that he also told his supervisor "[i]t's my break" when asking why he couldn't take a rest break. *See id.* at 73:2-5. However, Mr. Esquivel conceded that he worked alone on the nightshift with no supervisor to interfere with rest breaks. *See id.* at 65:13-17, 66:14-67:7. Mr. Esquivel then revised the basis for the allegedly missed rest breaks to allege that the workload, not his supervisor, interfered with his ability to take rest breaks. *See id.* at 65:21-66:13. Implausibly, Mr. Esquivel insisted that he worked twelve hours during the nightshift without stopping for any rest breaks or meal periods at all. *See id.* at 67:14-16.

The court finds that Mr. Esquivel's testimony not credible. Similar to his rest breaks, Mr. Esquivel testified that his supervisor denied him meal periods during the dayshift but that the workload prevented meals at night when Mr. Esquivel worked alone. *See id.* 65:13-66:1. But Mr. Esquivel did not directly or satisfactorily explain why the workload increased significantly during the nightshift. *See id.* 66:4-13. Further, as detailed in the discussion of Mr. Esquivel's meal period claim, Mr. Esquivel implausibly testified that his supervisor directed him to clock out for meal periods but work through the unpaid time. The testimony is inconsistent with Mr. Esquivel's timecards as explained in more detail below.[64] The court will not repeat the analysis here but identifies the issue at this point to demonstrate Mr. Esquivel's general lack of credibility. It is also worth noting that the testimony in general is not only fantastic on its own and when compared to conflicting evidence, but it is all self-serving. Based on all these issues, the court disregards Mr. Esquivel's testimony.

**Jose Martinez**: Mr. Martinez testified on direct examination that he did not receive ten-minute rest breaks during the claims period. *See* ECF No. 850:12-18. He did not state any basis for the allegedly missed rest breaks. He further testified that he began receiving rest breaks after the claims period and that the dairy instructed him to record these rest breaks. *See id.* at 19:19-25. Despite his testimony otherwise, Mr. Martinez indicated on cross examination when

---

[64] *See* pp. 62-63 *infra* (discussion regarding Mr. Esquivel's meal period claim).

addressing the substance of another claim that he doesn't stop working except "[d]uring the lunch and the break." *See id.* at 27:16. When directly asked about his ability to take rest breaks, Mr. Martinez changed his testimony from never to "on occasions," admitted that nobody prevented him from taking rest breaks, and acknowledged that nothing else prevented him from taking rest breaks at any particular time. *See id.* at 37:18-38:2. He conceded he had no records, memory, or other method to determine the duration or frequency of the rest breaks he received. *See id.* at 38:9-39:9. Mr. Martinez went through great efforts to avoid answering questions aimed at determining certain downtimes during the workday but, after lengthy questioning from debtors' counsel, Mr. Martinez finally admitted that during the downtime, "[a]t that time, I'm on break." *See id.* at 39:10-42:24. Finally, and after much necessary pressing, Mr. Martinez testified that the dairy made no reduction in his workload to accommodate the rest breaks he alleges he began receiving only after the claims period. *See id.* at 35:3-37:17.

The court cannot credit Mr. Martinez's initial testimony that he never received a ten-minute rest period during the claims period. First, he gave lengthy and serial nonresponses on cross examination in an apparent effort to avoid providing answers he thought might be unhelpful to his claim. And, as relayed above, he provided contradictory testimony on cross examination indicating that he received rest breaks regularly. Crucially, Mr. Martinez did not allege that the dairy prevented or discouraged him from taking rest breaks and, instead, readily conceded that he was able to do so and did. Furthermore, Mr. Martinez readily admitted that he has no way to determine the number and duration of informal rest periods he received during the claims period. Thus, calculating violations, if any, would be an exercise in speculation. Finally, the court concludes as it has with other claimants that the evidence that the dairy began requiring its employees to take and record rest breaks at certain times during the day cuts against the rest-break claims. The testimony here highlights this point especially well. Mr. Martinez readily conceded on cross examination that he was able to, and did, take informal rest breaks as necessary without interference from the dairy – yet stated on direct that he never received rest breaks. However, once the dairy began imposing rest breaks at regular intervals and requiring the employees to log these breaks, Mr. Martinez and other claimants all agree that they received their rest breaks. Again, this indicates the claimants incorrectly believe that one must be formally relieved of duty to receive a rest break.

**Jose Noel Ceja**: Mr. Ceja testified on direct examination that he did not receive ten-minute rest breaks during the claims period but started receiving them after the claims period. *See* ECF No. 848:166:13-19, 168:12-21. However, while still on

direct, Mr. Ceja conceded he received rest breaks while testifying on a separate matter. *See id.* at 171:7-9 (saying "I had to keep going . . . straight with what was going on after my break"). Mr. Ceja also did not testify that the dairy or any of its representatives denied or discouraged rest breaks. Incredibly, without any such predicate testimony, Mr. Ceja's counsel asked, "when did [your supervisor] tell you you couldn't take a break?," which prompted Mr. Ceja to respond that his supervisor did deny him rest breaks. *See id.* at 171:14-22. On cross examination, Mr. Ceja conceded he signed a form at the start of his employment acknowledging he reviewed documentation advising him of his rest break rights, though he maintained that his supervisor wouldn't allow the rest breaks and that he saw his supervisor "quite a lot" throughout the workday. *See id.* at 184:2-7, 186:6-14. However, Mr. Ceja then confirmed that he "spent most of [the] day" with another claimant who had already testified that he "rarely" saw the supervisor at issue. *See id.* at 186:15-19. Mr. Ceja did not satisfactorily explain the discrepancy between the conflicting testimony but seemed to concede that the other claimant's testimony was accurate. *See id.* at 186:20-187:22. In the end, Mr. Ceja did not explain why he could not take rest breaks in the absence of the supervisor at issue since that was the stated basis for the lack of rest breaks. Oddly, at the close of cross examination, Mr. Ceja appeared to concede that he received rest breaks during the claims period except while harvesting alfalfa because "[t]hey wanted it to be harvested." *See id.* at 188:10-23. Amplifying the confusion, on redirect, Mr. Ceja's counsel did not ask Mr. Ceja to clarify but restated the testimony to have an entirely different meaning: "you said that during harvest, you would receive some breaks." *See id.* at 189:9-10. After counsel recast the testimony, Mr. Ceja testified that at least some of his time harvesting alfalfa occurred outside the claims period. *See id.* at 189:16-21.

The court finds Mr. Ceja's testimony not credible. First, he failed to sufficiently explain how his supervisor inhibited rest breaks when Mr. Ceja was not in the supervisor's presence for most of the day. He also regularly vacillated between inconsistent statements and failed to reconcile inconsistencies with the testimony of other claimants. Just as significantly, his counsel presented questions on direct that supplied facts crucial to Mr. Ceja's claim and obviously revised his other testimony on redirect in a manner supporting the claim. While the facts Mr. Ceja's counsel supplied might be accurate and an attempt to correct any misstatements, the court cannot know because the information came from counsel rather than from Mr. Ceja.

**Maria Cuenca**:[65] During her deposition, Ms. Cuenca testified that she worked for only about three months at the dairy, always in the milking department and ultimately supervising all three milking shifts. *See* Ex. 56 at 11:23-12:10, 13:4-15. Ms. Cuenca never alleged that the dairy or some authority figure working for the dairy denied or discouraged her from taking rest breaks. Rather, she conceded that she could step away from the milking line for personal reasons without interference. *See id.* at 26:7-25. Ms. Cuenca further testified that the only limitations on leaving the milking line for personal reasons was to (i) inform her supervisor and (ii) go in intervals so only one person left the milking line at a time – she testified that these restrictions were not to limit the frequency or duration of the rest breaks but so the supervisor could ensure the milking line ran uninterrupted. *See id.* at 26:7-16, 29:7-22. Ms. Cuenca did testify that she witnessed one coworker receive a reprimand for making personal telephone calls but testified that the coworker engaged in multiple telephone calls "because the thing with her is that, you know, she had several children. So she was getting a lot of calls either from the school or from the clinic and from the babysitter . . . The supervisor at some point probably told her, you know, you have to keep working. You can't keep taking all of these phone calls." *See id.* at 27:13-28:1. Finally, Ms. Cuenca testified that she had no idea how many rest breaks she might have missed and would only be guessing due to the time lapse. *See id.* at 44:15-45:12.

Ms. Cuenca's testimony does not support her rest-break claims. She did not testify at all that she was not permitted to take informal rest breaks but testified to the contrary. Her testimony related to witnessing a coworker receive a reprimand for multiple personal calls reveals that Ms. Cuenca recognized the reprimand was for taking excessive personal time rather than for taking personal time at all. Interestingly, Ms. Cuenca seeks damages for rest-break violations for what appears to be every day she worked at the dairy. *See* ECF No. 852 at 27:2-3. For factual support, she cites to her deposition testimony where she testified that the only *scheduled* time she could leave the line was "just the work hours . . . [t]hat's it" (which the court understands to mean the end of the workday). *See id.* However, as mentioned repeatedly above and below, this simply reveals another instance where a claimant believes she need be formally relieved of duty for a break to count as a rest break. She also cites to her deposition testimony where she testified in relation to meal periods that employees "had their lunch, but then they got hungry after the lunch" but "that at that time they didn't have any other types of breaks." *See id.* While the court is uncertain as the meaning of this particular

---

[65] Ms. Cuenca could not attend the evidentiary hearing due to illness. As such, debtors' counsel consented to proceeding on Ms. Cuenca's claims via her deposition testimony. *See* ECF No. 842 at 4:4-5:3.

testimony, if Ms. Cuenca relies on this testimony for the proposition that she didn't receive any rest breaks, the court notes that a bare, unsupported statement that "at that time they didn't have any other types of breaks" without any kind of context simply does not rise to an allegation that the dairy denied or discouraged employees from taking such breaks. Further, if offered for that purpose, it conflicts with Ms. Cuenca's prior testimony indicating she could leave the milking line and attend to personal matters as needed. For these reasons, the court concludes that Ms. Cuenca is not entitled to damages for allegedly missed rest breaks.

**Maria Guadalupe Georgina Velasquez**:  On direct examination, Ms. Velasquez simply testified that she did not receive rest breaks of ten minutes during the few days she worked at the dairy as a milking employee.  *See* ECF No. 843 at 19:6-16. The court finds Ms. Velasquez's testimony not supportive of her claim for two reasons.  First, she did not indicate that the dairy denied or discouraged her in any way from taking the allegedly missed rest breaks.  Second, the court finds Ms. Velazquez's testimony generally not credible.  As discussed in more detail below, Ms. Velasquez testified that she quit the dairy based on information she learned from her paystub, but somehow quit well before receiving the paystub.[66]  Ms. Velasquez's error appears to result from a faulty memory rather than fabrication, however, the certainty of her memory despite its basic temporal impossibility renders her memory unreliable for more minor details.

**Maria Ochoa**:  On direct examination, Ms. Ochoa testified that she received only one fifteen-minute rest break per day as an outside employee but did not receive a second due to the workload and because she "would have been yelled at, or . . . given a warning."  *See* ECF No. 846 at 121:9-15, 123:17-124:5.  Ms. Ochoa did not specifically state why the workload inhibited a second rest break or identify who would reprimand her for taking a second rest break.  Ms. Ochoa also testified that she received daily breaks as a milking employee when one of her "co-workers would say, 'I need to take a break.'"  *See id.* at 124:6-10.  On cross examination, Ms. Ochoa testified that, when she worked in the milking department, she was able to step away to get some water or take a deep breath in addition to the more formal break she received there.  *See id.* at 128:4-19.  Ms. Ochoa also testified that she took her fifteen-minute rest break as an outside employee with all her coworkers and that nobody told them to do so but "[i]t was something that was just done." *See id.* at 132:22-133:18.  She also testified that she was able to step away from work outside the fifteen-minute rest break for telephone calls, to get coffee or

---

[66]  *See* pp. 74-76 *infra.*

water, or retrieve items from her lunchbox.  *See id.* at 133:20-25, 134:15-24.  The court found Ms. Ochoa generally credible but also finds her testimony does not support her rest break claims.

First, Ms. Ochoa did not identify the status of any individual who allegedly discouraged her from taking rest breaks.  Second, Ms. Ochoa readily testified that she was able to, and did, stop working to attend to personal matters outside of the more formal rest breaks she received.  Thus, the court finds that she received rest breaks in addition to the more formal rest breaks she identified.  Further, Ms. Ochoa did not provide a method to identify the frequency or duration of any rest she did not receive.  Finally, the court also notes that this is yet another example of a claimant failing to recognize that one need not be formally relieved of duty for a rest break to be legally compliant.

**Raul Vasquez**: On direct examination, Mr. Vasquez testified that he worked as a milking employee for the dairy and didn't receive rest breaks until the last two months of his employment when the dairy began mandating rest breaks.  *See* ECF No. 849 at 15:8, 17:13-18:1.  Mr. Vasquez did not provide a basis for the allegedly missed rest breaks.  On cross examination, Mr. Vasquez testified that, before the purported policy change on rest breaks, he was able to leave the milking line to use the restroom, make a personal phone call, or step away as needed.  *See id.* at 32:21-33:13.  Despite being relieved from duties, Mr. Vasquez revealed that he did not consider these periods as rest breaks but did consider more formal rest breaks received after the policy change as compliant rest breaks.  *See id.* at 39:6-23 (confirming that he was able to step away from the milking line for personal reasons "but not as breaks . . . just -- if we needed to, we can"); 31:18-20 (stating that employees received "two breaks per shift" after the dairy's new rest break policy when "they started *offering* us breaks").  Mr. Vasquez also testified that he had no way to determine the frequency or duration of the periods when he stepped away from work to attend to personal matters.  *See id.* at 39:24-40:5, 41:6-9, 42:23-43:4.  Mr. Vasquez did testify that he and his coworkers took time to eat and rest during the daily cleaning of the milking equipment.  *See id.* at 36:6-15.

The court finds Mr. Vasquez sincere and forthright but finds no evidence to support his rest-break claim.  First, while he testified that he did not receive breaks, he did not testify that any authority figure at the dairy denied or discouraged the taking of rest breaks or otherwise provide a reason for the allegedly missed rest breaks.  Second, Mr. Vasquez's testimony reveals that his allegations of missed rest breaks is based on his misunderstanding that such breaks need be formally announced to be compliant.  He testified that he could, and did, step away from his

duties to attend to personal matters as needed and without a formal announcement or interference. However, he deemed only formally provided rest breaks as compliant as demonstrated by his testimony related to rest breaks *after* the dairy's revised policy.

**Victor Licona**: On direct examination, Mr. Licona testified that he "never received any break" during the claims period, and if he attempted to take a rest break "the person in charge . . . got upset." ECF No. 842 at 29:6-9. However, he did not identify the "person in charge." On cross examination, Mr. Licona testified that a specific supervisor who Mr. Licona commonly worked with stopped working to retrieve water for himself as needed. *See id.* at 79:14-21. Mr. Licona then testified that he did not do so because the supervisor "didn't say, like, oh, take five, get a break . . . [h]e wouldn't say, like, go and drink water." *See id.* at 79:23-80:6. Mr. Licona did not identify this supervisor as the one who "became upset" and also conceded that "[n]o one told us to not drink water." *See id.* at 80:9-10.

As explained in detail below, the court finds Mr. Licona's testimony generally unreliable for a variety of reasons and declines to assign it any weight.[67] Specifically relevant for purposes here, Mr. Licona's testimony is revealing in that his allegations of missed rest breaks are based on the faulty premise that one needs to be formally relieved of duty for rest breaks to be compliant.

\*　\*　\*

In sum, the record before the court does not support awarding any claimant damages for missed rest breaks. In many instances, the witness testimony indicates that the claimants could, and did, take informal rest breaks at their discretion, which is consistent with the dairy's policy at the time and with the testimony from the Mensonides family members. To the extent some breaks were missed or insufficiently short, there ultimately is no basis in the record for the court to perform any of the necessary calculations without engaging in legally impermissible speculation or conjecture. Therefore, the debtors' objections to the rest-break claims are sustained.

## *Meal Periods*

In addition to alleging rest-break violations, claimants contend that the dairy failed to provide them with meal periods that comply with Washington state

---

[67]　*See* pp. 69-70 *infra* (discussion regarding Victor Licona's meal period claim).

authority. This failure, claimants assert, entitle them to damages in the form of their hourly wages for the noncompliant meal periods. As the legal bases for the alleged meal-period violations, claimants rely on two sources of authority.

## I. Washington Administrative Code 296-131-020(1)

As one basis, claimants cite regulations promulgated in WAC 296-131-020(1), which provides: "Every employee employed more than five hours shall receive a meal period of at least thirty minutes. Employees working eleven or more hours in a day shall be allowed at least one additional thirty-minute meal period."[68] Based on this language, claimants argue that the dairy owes them thirty minutes of wages for any missed meal periods and for those of noncompliant duration.

The debtors do not contest claimants' assertion that the regulation creates an employer's liability for noncompliance or that employees are entitled to wages for any noncompliant periods.[69] The debtors do, however, contend that they complied with the regulation and, therefore, contest that they are liable for any damages. As such, the court will assess liability for any meal periods of noncompliant duration when an employee's workday exceeded the five and eleven hour periods set forth in the regulation.

## II. Department of Labor and Industries Administrative Policy ES.C.6.2

Claimants rely primarily and heavily on the Department of Labor and Industries' ("L&I") policy interpreting WAC 296-131-020(1). Through Administrative Policy ES.C.6.2, L&I expressed the view that the regulation requires that "[e]mployees cannot work more than five hours without being allowed an uninterrupted meal period" and providing "[f]or example, if an employee begins working at 6:00 AM, the meal period must begin no later than 11:00 AM."[70] Finally, claimants cite to a webpage on L&I's website containing language stating that "[t]he employer must ensure workers receive their meal period. . . . Workers must be paid for meal breaks if the meal period is interrupted

---

[68]  WAC 296-131-020(1).

[69]  The court notes that WAC 296-131-020 itself does not expressly create a private right of action or set forth remedies for violating paragraph (1).

[70]  *See* Claimants' Post-H'rg Br., ECF No. 851 at 11:21-12:1, 12:6-7 (citing L&I Administrative Policy ES.C.6.2 at 2 (revised March 10, 2020) and found at: https://lni.wa.gov/workers-rights/_docs/esc6.2.pdf).

**MEMORANDUM DECISION**      Page 35

and they are called back to work."[71]  Piecing these two advisory opinions together, claimants further contend that the dairy owes them thirty minutes of wages any time their first meal period of the day did not begin by the sixth hour of work.  The court sees two immediate problems with claimants' reliance on L&I's policy statement.

*First*, claimants cite no authority for, or otherwise address, their assumption that this administrative policy creates (i) a cause of action personal to an employee for an employer's alleged failure to comply with the policy and (ii) a method for determining damages in any such suit.  Claimants' assumption is at odds with L&I's own expression of the legal force of its policy.  In the preamble to Administrative Policy ES.C.6.2, L&I explains that:

> This policy is designed to provide general information in regard to the current opinions of the Department of Labor & Industries on the subject matter covered. This policy is intended as a guide in the interpretation and application of the relevant statutes, regulations, and policies, and may not be applicable to all situations. This policy does not replace applicable RCW or WAC standards.[72]

In other words, the policy reflects L&I's internal agency opinion regarding the state of the law, but it does not carry the force of law.[73]  While Washington courts have used L&I policies in varying degree to aid in resolving labor disputes elsewhere, the Washington Supreme Court has ruled that "administrative policies have no force or effect as a law *or regulation.* While the level of deference owed to regulations is an issue of ongoing debate, administrative policies do not even have the force of regulations, and deference to such policies is inappropriate because this court has the ultimate authority to interpret a statute."[74]  Since claimants do not point to any binding or persuasive authority adopting the policy at issue here as carrying the force of law, claimants have provided no basis on which to deploy L&I's Administrative Policy ES.C.6.2 in the manner they propose.

---

[71]  *See* ECF No. at 12:9-18 (citing Agriculture Polices: Rest Breaks & Meal Periods, Wash. Dep't of Lab. & Indus., https://lni.wa.gov/workers-rights/agriculture-policies/rest-breaks-and-meal-periods (last visited June 23, 2021).

[72]  *Id.* at 1.

[73]  *Cf. Sharp v. FDIC (In re Vineyard Nat'l Bancorp)*, 508 B.R. 437, 446 (Bankr. C.D. Cal. 2014) (explaining that an interagency policy statement issued by several federal banking regulators detailing their views about how income tax refunds should be allocated among a consolidated group "is a non-binding policy statement and is not material to adjudicate ownership of the refund," including because "nothing in the Interagency Policy Statement renders it legally binding or has the force of law").

[74]  *Carranza v. Dovex Fruit Co.*, 190 Wash. 2d 612, 624–25 (2018) (cleaned up).

**MEMORANDUM DECISION**          Page 36

**Second**, and more significantly, the version of Administrative Policy ES.C.6.2 claimants cite is temporally irrelevant. L&I did not adopt the cited version until March 10, 2020[75] – almost two years after the claims period ended. Moreover, L&I added ***all*** of the language on which claimants rely in the 2020 revision. In contrast, the prior version, revised August 11, 2016, is nearly silent on the subject of meal periods making only the following bare reference:

### 5. What is the difference between pay for meal periods and rest periods for agricultural workers?

> Meal periods are unpaid as long as the workers are fully relieved of duties during the entirety of their meal periods.[76]

Nothing about this language gives way to the legal ramifications claimants invoke from the 2020 version. Because it would be unfair if not absurd to hold debtors to standards unarticulated by L&I or anyone else during the operative period, claimants' reliance on the later version of L&I's policy is misplaced. Thus, even assuming the policy carried some level of legal significance regarding claims asserted by individual workers at present, the court cannot apply the standards retroactively.[77] Thus, the court denies any claims that are based on L&I's policy. Specifically, the court rejects claimants' theory that debtors are liable for damages whenever a claimant received his or her first meal period after the fifth hour of work.[78]

---

[75] *See* https://lni.wa.gov/workers-rights/_docs/esc6.2.pdf (revised March 10, 2020).

[76] Dept. of Labor and Industries Administrative Policy ES.C.6.2 at 2 (revised August 11, 2016). Found at: https://perma.cc/AKX8-RP5F. *See Dovex Fruit Co.*, 190 Wash.2d at 639 (2018).

[77] The court notes that claimants rely on the 2020 version of Administrative Policy ES.C.6.2 for the overwhelming majority of their alleged meal-period violations.

[78] Claimants might take the position that the regulation itself imposes liability on an employer for any meal periods received beyond the first five hours of the workday. This is incorrect. The regulation requires that employees who work beyond five hours in a day receive at least a thirty-minute meal period and an additional meal period of the same duration for employees who work eleven hours or more. *See* WAC 296-131-020(1). The regulation is silent as to the specific timing of either meal period, leaving the parties to the employment relationship to set aside suitable times. As mentioned above, this omission is telling since the corresponding regulation governing nonagricultural employees' meal periods has very specific timing requirements. *See* WAC 296126-092(1), (2) (providing that meal periods must "commence[] no less than two hours nor more than five hours from the beginning of the shift" and that "[n]o employee shall be required to work more than five consecutive hours without a meal period."). In order to support their claims, claimants invite the court to write this same timing requirement into the regulation at issue here. The court declines to do so. As a final note on the matter, the court notes that the L&I opinions that claimants combine to impose liability for these purposes do not appear to support their position. While the language claimants cite from L&I's website expressly advises that employees are entitled to wages for ***interrupted*** meal periods, neither that language nor any in

III.  Liability and Damages

In determining liability, the court weighed the credibility of each claimant's testimony, and to the extent each claimant presented a prima face case, the court examined in detail the claimant's timecards to determine the number of noncompliant periods and resulting damages.[79]  A factor complicating this evaluation is that milking employees did not clock in and out for meal periods until an unidentified date late in the claims period, thus often leaving the court with no records to review.[80]  In the absence of relevant time records, the court considers the viability of the milking employees' alleged meal-period violations based on the credibility of a claimant's testimony alone.

Because the debtors do not contest claimants' methods for calculating damages, the court employs similar formulas.  Specifically, for each noncompliant period, claimants receive thirty minutes of compensation at their applicable rate of pay.  For claimants compensated on an hourly basis, claimants receive half their hourly rate for each noncompliant period.  For claimants paid a shift rate, the court divides the rate into a hypothetical eight-hour day to arrive at the hourly rate in the manner claimants propose.  The court then uses that number to calculate damages in the same fashion used for hourly employees.  Finally, when reviewing timecards, the court assesses no damages for periods that would be noncompliant but for two minutes or less.  This includes both the duration of the meal periods themselves and the duration of the workday.  Specifically, the court assesses no violations for meal periods of twenty-eight minutes or more during workdays up to eleven hours or fifty-eight minutes on workdays exceeding eleven hours.  Likewise, the court assesses no violations for the lack of a meal period on workdays of five hours and two minutes nor when a meal period is compliant with a workday of five to eleven hours but the timecards show a workday of eleven

---

Administrative Policy ES.C.6.2 provide the same treatment for meal periods that do not start at a specific time during the workday.

[79]  *See Brady v. Autozone Stores, Inc.*, 188 Wash. 2d 576, 584 (2017) ("[A]n employee asserting a meal break violation . . . can meet his or her prima facie case by providing evidence that he or she did not receive a timely meal break.  The employer may then rebut this by showing that in fact no violation occurred or a valid waiver exists" which the court found "should not be an onerous burden on the employer, who is already keeping track of the employees time for payroll purposes").

[80]  According to the herd manager, the shift rate for milking employees included a paid thirty-minute meal period obviating the need for those employees to record the meal periods.  *See* ECF No. 845 at 116:1-5 ("[T]he milkers were being paid for their 30-minute lunch so we never required any clocking in and out because it was already paid into it.  So we didn't feel that they needed to -- to record it.").  *See also, e.g., id.* at 120:7-10.  The herd manager also testified that the dairy converted milking compensation from a shift rate to an hourly rate towards the end of the claims period, at which time the dairy stopped paying for meal periods and, therefore, began requiring milking employees to clock in and out for meal periods.  *See id.* at 128:6-8.

hours and two minutes. The clocking in and out in overly specific windows of time can be a matter of happenstance and requiring an employer to monitor meal periods down to such miniscule windows to avoid liability is overly, and unnecessarily, burdensome and practically unrealistic. Just as importantly, as the Ninth Circuit Court of Appeals recognized when reviewing a similar situation, "employees cannot recover for otherwise compensable time if it is *de minimis*."[81] In the context of this dispute, a minute or two of missed meal period still provides the employee with more than 90% of the required time and hence those missed few minutes are *de minimis*. With these factors in mind, the court now turns directly to assessing damages for any noncompliant meal periods claimant by claimant.[82]

**Adan de la Mora**: On direct examination, Mr. De La Mora testified that on days he worked in excess of five hours he did not always receive a meal period or that they were sometimes less than thirty minutes. *See* ECF No. 846 at 98:22-99:3; 100:14-16. Mr. De la Mora testified that he always received at least an hour meal period on days he worked in excess of eleven hours. *See id.* at 102:12-14. Thus, Mr. De la Mora's claims are limited to those periods when his timecards show no meal periods or those of less than thirty minutes on workdays less than eleven hours. While Mr. De La Mora testified that he typically clocked out for his meal periods, he also testified on both direct and cross examination that there were times when he could not reach the timeclock to do so but that he would inform his supervisor of these incidents so the timecards could properly reflect the meal periods. *See id.* at 99:4-100:13; 112:7-24. On cross examination, counsel for debtors did not ask Mr. De la Mora whether there were instances when Mr. De la Mora actually took a full meal period that was not reflected on the timecards. Mr. De la Mora did testify on cross examination that his timecards accurately reflected the days on which he received meal periods less than the required amount. *See id.* at 113:22-114:3. The court finds no reason to disbelieve Mr. De la Mora's testimony on this matter and awards Mr. De la Mora damages based on a review of

---

[81] *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 904-05 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005). *See also id.* (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946) ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours . . . such trifles may be disregarded, for split-second absurdities are not justified by the actualities or working conditions.")). Although the referenced portions of *Alvarez* involved the application of the Fair Labor Standards Act, the commonsense approach is equally applicable to the Washington regulation at issue here.

[82] As discussed above in relation to claimants' other theories of liability, it is not possible to determine from claimants' filings the exact basis for the damages they seek here since counsel's declaration uses the generic term "meal period violation" and a raw number to calculate damages attributable to both meal periods of noncompliant duration and those that allegedly violated L&I Administrative Policy ES.C.6.2 – a theory the court rejects. *See, e.g.*, Decl. of Charlotte Mikat-Stevens in support of Claimants' Post-H'rg Br., ECF No. 852 at 6:17-14. Thus, the court closely reviewed the timecards to ascertain those meal periods of noncompliant durations that warrant damages.

the timecards. During the claims period, Mr. De la Mora's timecards reflect the following noncompliant meal periods:

(1) five meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $12.00 per hour equaling five half-hour noncompliant periods for damages of $30.00;

(2) nine meal periods of less than thirty minutes on workdays between five and eleven hours at $12.00 per hour equaling nine half-hour noncompliant periods for damages of $54.00;

(3) eight missed meal periods on workdays between five and eleven hours at $12.00 per hour equaling eight half-hour noncompliant periods for damages of $48.00;

(4) five missed meal periods on workdays between five and eleven hours at $12.50 per hour equaling five half-hour noncompliant periods for damages of $31.25;

(5) six meal periods of less than thirty minutes on workdays between five and eleven hours at $12.50 per hour equaling six half-hour noncompliant periods for damages of $37.50;

(6) six meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $12.50 per hour equaling six half-hour noncompliant periods for damages of $37.50;

(7) two meal periods of less than thirty minutes on workdays exceeding eleven hours at $12.50 per hour equaling four half-hour noncompliant periods for damages of $25.00;

(8) nine missed meal periods on workdays between five and eleven hours at $14.00 per hour equaling nine half-hour noncompliant periods for damages of $63.00;

(9) fifteen meal periods of less than thirty minutes on workdays between five and eleven hours at $14.00 per hour equaling fifteen half-hour noncompliant periods for damages of $105.00; and

(10) seven meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $14.00 per hour equaling seven half-hour noncompliant periods for damages of $49.00.

Total = $480.25

**Alberto Flores**: Mr. Flores worked exclusively in the dairy's milking department from the beginning of the claims period through May 2016.  *See* ECF No. 850 at 44:22-45:4.  All of Mr. Flores' time at the dairy preceded the period in which the dairy began to require milking department employees to clock out for meal periods, so his timecards do not reflect the date or duration of those periods.  On direct examination, Mr. Flores testified that the dairy never permitted its dairy employees meal periods.  *See id.* at 57:5-19.  Mr. Flores did not testify who denied him such opportunities.  On cross examination, Mr. Flores conceded that he was able to heat up his lunch and that he and his coworkers "wouldn't always take a lunch. But when we would take a lunch, three -- probably just three people were taking -- had lunch."  *See id.* at 94:25-95:2.  He also named several coworkers who were able to take meal periods regularly and were "[t]he ones who took lunch more often."  *See id.* at 94:25-95:2.  Mr. Flores conceded that he had no way to determine the frequency or duration of his meal periods.  *See id.* at 94:19-95:25.  While Mr. Flores confirmed that the periods were less than thirty minutes, the court gives this testimony little weight as his counsel provided the entire content of the testimony and simply asked Mr. Flores to confirm information.  *See id.* at 97:7-12.

The court also finds that Mr. Flores' testimony generally lacks credibility since he was unable to accurately recall relevant details.  For example, Mr. Flores repeatedly testified that he always clocked out for the end of his shift when he finished work entirely.  *See id.* 63:11-14, 73:12-74:1, 84:19-22.  He also testified that he almost always worked at least thirty minutes, and often more, beyond eight hours and that he "never" or "rare[ly]" finished working within eight hours.  *See id.* 47:12-19, 60:22-24, 62:22-63:7, 77:15-21.  However, on cross examination, Mr. Flores conceded that a significant number of his timecards reflect workdays of less than eight hours and even fewer days exceeding an additional thirty minutes.  *See id.* at 81:17-85:18.  Mr. Flores explained the discrepancy in two ways.  First, he reversed earlier testimony to state that he clocked out ***before*** finishing all his duties, therefore he actually worked longer than his timecards reflected.  *See id.* at 83:5-18.  Second, after debtors' counsel pointed out that Mr. Flores' explanation contradicted his prior testimony, Mr. Flores explained that, when testifying about rarely finishing before eight hours, he was "talking about ten years ago" when the dairy had significantly more cows and "he would milk 6,000 cows . . . the whole shift" and that after the dairy "sold part of the cows . . . that lowered the number of cows."  *See id.* 86:18-87:10.  Thus, not only is it apparent that Mr. Flores' memory is inaccurate, but his testimony also conflates events occurring during the claims

period and other events. Both reasons render the testimony unreliable. Thus, the court cannot award damages based on Mr. Flores' testimony.

**Alfonso Gallardo**: Mr. Gallardo worked in the dairy's calving department from at least November 16, 2015 through June 15, 2017. *See* Ex. 21. Mr. Gallardo was unavailable to testify thus the court awards damages based on the dairy's timecards admitted as Exhibit 21. These documents show the following noncompliant periods:

(1) two missed meal periods on workdays lasting between five and eleven hours at $14.00 per hour equaling two half-hour noncompliant periods for damages of $14.00; and

(2) fifty meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $14.00 per hour equaling the same number of half-hour noncompliant periods for damages of $350.00.

Total = $364.00

**Alfredo Sanchez**: On direct examination Mr. Sanchez testified that he began clocking out for meal periods at some unspecified time during the last year of his employment at the dairy. *See* ECF No. 842 at 114:23-115:4. He gave conflicting testimony on direct about whether he received meal periods before this period. *See id.* at 115:5-7 (stating that he received no meal periods); 115:8-9 (stating that he ate "[o]nly when it was lunch"); 115:23-24 (denying that he received meal periods). On both direct and cross examination, Mr. Sanchez also testified that, once he began clocking out for meal periods, his supervisor instructed him to punch out, take fifteen minutes for lunch, return to work, then clock in afterwards to show that Mr. Sanchez received thirty minutes for each meal period. *See id.* at 115:12-116:24, 125:7-126:2. On cross examination, Mr. Sanchez testified that his workload of helping to birth ten to twenty-five cows per shift precluded any opportunity to stop for a meal period. *See, e.g.*, *id.* at 129:12-13. Mr. Sanchez also admitted that he worked alone and that no one would know if he stopped for a meal period. *See id.* at 127:18-128:20. Finally, Mr. Sanchez conceded that he recollected a few times during which he took a meal period and that there was "down time" during his shift. *See id.* at 121:9-13, 129:1-9. During the period in which Mr. Sanchez began clocking out for meal periods, his timecards show that he missed one meal period, received one meal period of only fifty-nine minutes for a shift lasting eleven hours and forty-seven minutes, and received meal periods totaling less than one hour during shifts he worked in excess of eleven hours. *See*

**MEMORANDUM DECISION**          Page 42

Ex. 22 at 3331-3336. This adds up to a total of 46 potential noncompliant meal periods.

However, the court finds that Mr. Sanchez's testimony lacks credibility. First, as noted above, Mr. Sanchez testified that his timecards were inaccurate because his supervisor required him to clock out for only thirty minutes while only being relieved of duty for fifteen. This conflicts with Mr. Sanchez's timecards. The timecards show that the overwhelming majority of Mr. Sanchez's meal periods were at least thirty minutes and a significant number actually exceeded an hour. *See, e.g.*, *id.* at 3332 (entries for December 7, 2016 through December 10, 2016 all show meal periods of at least sixty minutes). Thus, his testimony that he clocked out for only fifteen minutes is wholly inconsistent with the objective evidence. Mr. Sanchez's answers were also often inconsistent, evasive, and nonresponsive to questioning. For example, after testifying that between ten and twenty-five cows were born during his shift, Mr. Sanchez refused to provide responsive answers to straightforward and simple questions posed by debtors' counsel aimed at clarifying the testimony, thereby requiring unnecessarily extensive questioning to do so. *See* ECF No. 842:129:12-132:22. Related to the substance of Mr. Sanchez's testimony on this topic, the herd manager credibly testified that less than half the number of births occurred. *See* ECF No. 845 at 112:17-113:11 (testifying that an average of ten to twelve calves were born ***per day***). The court does not speculate whether Mr. Sanchez's behavior and inconsistencies resulted from memory lapses or other factors. Whatever the basis, the court cannot rely on any of the largely self-serving testimony or the timecards that Mr. Sanchez insists are inaccurate. Thus, Mr. Sanchez has not met his prima facie case and is awarded no damages for his meal-period claim.

**Ana Cruz**: On direct examination Ms. Cruz testified that she received a meal period every shift, that she punched in and out for the periods, that she did not receive any of more than thirty minutes, but that she often received ones of shorter duration. *See* ECF No. 847 at 15:3-16. Ms. Cruz also testified that her foreman instructed Ms. Cruz to take her meal periods. *See id.* at 16:2-6. On cross examination, counsel for debtors did not ask Ms. Cruz whether there were instances where Ms. Cruz actually took a full meal period that was not reflected on the timecards. Ms. Cruz did concede, though, that the timecards were more accurate than her memory. *See id.* at 23:23-24:1. Ms. Cruz's timecards reveal that she actually received meal periods often in excess of two hours. *See, e.g.*, Ex. 23 at 3337 (entries for June 6, 2015 through June 8, 2015 all showing meal periods in excess of two hours); 3342 (entries for August 22, 2015 through August 24, 2015

showing same).  Beginning on June 6, 2015, Ms. Cruz's timecards show the following noncompliant periods:

(1) eight missed meal periods on workdays between five and eleven hours at $10.75 per hour equaling eight half-hour noncompliant periods for damages of $43.00;

(2) one meal period lasting between thirty and sixty minutes on a workday exceeding eleven hours at $10.75 per hour equaling one half-hour noncompliant period for damages of $5.38;

(3) fifteen missed meal periods on workdays between five and eleven hours at $11.25 per hour equaling fifteen half-hour noncompliant periods for damages of $84.38;

(4) ten meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $11.25 per hour equaling the same number of half-hour noncompliant periods for damages of $56.25; and

(5) one meal period of less than thirty minutes on a workday lasting between five and eleven hours at $11.25 per hour equaling one half-hour noncompliant periods for damages of $5.63.

Total = $194.64

**Antonio Licona**:  Mr. Licona testified that he was employed at the dairy from the beginning of the claims period through November 2017.[83]  *See* ECF No. 848 at 8:8-12.  Mr. Licona testified that, throughout the entire claims period, all of his meal periods were less than thirty minutes in duration.  *See id.* at 26:16-24, 36:17-19.  Mr. Licona testified that the one time he attempted to take a full thirty minutes for his meal period, "they called him out . . . the one in charge."  *See id.* at 27:1-12; *see also* 36:20-25.  Mr. Licona could not approximate a time period during which this event occurred and did not identify the "one in charge."  Mr. Licona answered in the affirmative to his counsel's leading question positing that he "work[ed] at least twelve hours a day, but sometimes more; is that correct?"  *See id.* at 27:19-21; *see also* 51:21-23 (responding in the affirmative to a second leading question on redirect asking, "you worked at least 11 or more hours in each shift; is that

---

[83]   To avoid any confusion, the court notes that (1) the transcript spells Mr. Licona's last name as "Decona" and (2) two claimants share the same last name – Antonio Licona, the instant claimant, and Victor Licona discussed below.

correct?").  Mr. Licona testified on cross examination that he did not begin to punch out for meal periods until "towards the end" of his employment but could not remember exactly when, and conceded after a series of pressing questions that he did actually receive at least thirty-minute meal periods once he began clocking out.  *See id.* at 37:6-38:19, 39:1-11; *see also* 49:22-50:11, 51:16-20.  Although insisting that his meal periods were less than thirty minutes, Mr. Licona also conceded that he had no way to identify the duration of his meal periods before the date he began clocking out to record the periods.  *See id.* at 40:1-6, 41:3-42:16, 43:21-44:4.

For a few reasons, the court awards no damages to Mr. Licona for the period preceding the date he began clocking our for meal periods.  First, Mr. Licona conceded on cross examination that he had no way to determine the length or number of any of these allegedly noncompliant meal periods, which means any associated calculation would necessarily be speculative or conjectural.  Second, Mr. Licona's testimony about the duration of his workdays directly conflicts with his timecards.  As mentioned, Mr. Licona unequivocally confirmed in response to a leading question that his workdays exceeded twelve hours during the entire claims period.  Contrarily, while Mr. Licona's timecards show some workdays exceeding twelve hours prior to the period he began clocking out for meal periods, the overwhelming majority of these days were shorter.  *See* Ex. 2 at 3359-3395.  Since the court cannot rely on Mr. Licona's memory to determine the length of his workdays during this period, the court finds that it cannot rely on that same memory to determine the length of his meal periods.  However, Mr. Licona's testimony did not discredit the general accuracy of his timecards from the date he began clocking out for meal periods.  The time entries reflect that he began doing so on December 16, 2016.  Thus, the court assesses damages for noncompliant periods shown on the timecards starting on this date.  These documents reflect the following noncompliant periods:

(1) thirteen meal periods between thirty and sixty minutes on workdays exceeding eleven hours at $15.75 per hour equaling thirteen half-hour noncompliant periods for damages of $102.38;

(2) 222 meal periods between thirty and sixty minutes on workdays exceeding eleven hours at $16.00 per hour equaling the same number of half-hour noncompliant periods for damages of $1,776.00; and

(3) one meal period of less than thirty minutes on a workday exceeding eleven hours at $16.00 per hour equaling two half-hour noncompliant periods for damages of $16.00.

Total = $1,894.38

**Armando Madero**: Mr. Madero worked exclusively in the dairy's milking department from October 14, 2017 to November 18, 2017. *See* Ex. 15; ECF No. 849 at 57:15-16. Mr. Madero testified that he clocked in and out for his meal periods but that he did not always receive compliant meal periods. *See id.* at 65:2-66:5, 67:15-68:4. However, Mr. Madero did concede that he received at least some meal periods. *See, e.g.*, 58:10-11, 67:20-21. While the court finds Mr. Madero's testimony generally problematic for the reasons discussed in relation to his rest-break claim,[84] nothing in his testimony discredited the accuracy of his timecards. Thus, the court will rely on these documents to calculate meal period damages. The timecards show the following noncompliant periods:

(1) four meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $100.00 per shift equaling four half-hour noncompliant periods for damages of $25.00;

(2) five missed meal periods on workdays lasting between five and eleven hours while claimant earned $100.00 per shift equaling five half-hour noncompliant periods for damages of $31.25;

(3) two meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling two half-hour noncompliant periods for damages of $14.38; and

(4) three missed meal periods on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling three half-hour noncompliant periods for damages of $27.57.

Total = $55.80[85]

---

[84]  *See* p. 19 *supra* (discussion regarding Mr. Madero's rest break claim).

[85]  This amount came from claimants' briefing. *See* ECF No. 852 at 11:17. The court calculated damages of $98.20 but awards only those damages actually sought.

**MEMORANDUM DECISION**          Page 46

**Candelario Herrera**: On direct examination, Mr. Herrera testified that he typically clocked out for meal periods but informed Amy Mensonides on days that he could not. *See* ECF No. 842 at 89:7-23. On both direct and cross examination, Mr. Herrera emphasized that his timecards accurately depicted both the length of the meal periods he received and those he missed entirely. *See id.* at 90:5-9, 91:9-11, 100:1-4, 101:14-23. None of Mr. Herrera's testimony addressed whether he had failed to report any meal periods he received but were not logged on his timecards. Aside from a few less significant anomalies likely a result of memory lapses, the court finds Mr. Herrera's testimony generally credible on this matter and awards damages based on a review of the timecards. During the claims period, Mr. Herrera's timecards show the following noncompliant periods:

(1) three missed meal periods on workdays lasting between five and eleven hours while claimant earned a shift rate of $170.00 equaling three half-hour noncompliant periods for damages of $31.88;

(2) thirty-two missed meal periods on workdays lasting between five and eleven hours while claimant earned a shift rate of $154.50 equaling thirty-two half-hour noncompliant periods for damages of $308.96;

(3) three missed meal periods on workdays between five and eleven hours at $15.45 per hour equaling the same number of half-hour noncompliant periods for damages of $23.18;

(4) nineteen missed meal periods on workdays between five and eleven hours at $16.00 per hour equaling the same number of half-hour noncompliant periods for damages of $152.00;

(5) one missed meal period on a workday exceeding eleven hours at $16.00 per hour equaling two half-hour noncompliant periods for damages of $16.00;

(6) seventy-eight missed meal periods on workdays between five and eleven hours at $17.00 per hour equaling the same number of half-hour noncompliant periods for damages of $663.00;

(7) two meal periods of less than thirty minutes on workdays between five and eleven hours at $17.00 per hour equaling two half-hour noncompliant periods for damages of $17.00;

(8) five meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $17.00 per hour equaling the same number of half-hour noncompliant periods for damages of $42.50; and

(9) nine missed meal periods on workdays exceeding eleven hours at $17.00 per hour equaling twice the number of half-hour noncompliant periods for damages of $153.00.

Total = $1,407.52

**Carlos Balcazar**: Mr. Balcazar worked exclusively, but not continuously, in the dairy's milking department from August 29, 2016 through the end of the claims period. *See* Ex. 25. Since Mr. Balcazar was unavailable to testify, the only evidence of noncompliant meal periods comes from the dairy's timecards admitted as Exhibit 25. The majority of Mr. Balcazar's employment at the dairy preceded the period in which the dairy began to require milking department employees to clock out for meal periods, thus, the timecards do not reflect the date or duration of these meal periods. As such, the court cannot award damages for such instances in the absence of credible testimony from Mr. Balcazar himself. However, the court awards damages based on the noncompliant periods reflected in the timecards starting from the date those records reflect a consistent recording of these periods.[86] These documents reflect the following noncompliant meal periods:

(1) six meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling six half-hour noncompliant periods for damages of $43.14;

(2) twenty-four missed meal periods on workdays lasting between five and eleven hours while claimant earned $120.00 per shift equaling twenty-four half-hour noncompliant periods for damages of $180.00;

(3) 232 meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $120.00 per shift equaling the same number of half-hour noncompliant periods for damages of $1,740.00;

(4) seven meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $127.50 per shift equaling seven half-hour noncompliant periods for damages of $55.79;

---

[86]   The timecards reflect Mr. Balcazar began recording his meal periods on October 8, 2016. *See* Ex. 25 at 3505.

(5) six missed meal periods on workdays lasting between five and eleven hours while claimant earned $132.86 per shift equaling six half-hour noncompliant periods for damages of $49.83; and

(6) four meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $132.86 per shift equaling four half-hour noncompliant periods for damages of $33.22.

Total = $2,101.98

**Ezekiel Balderama**: On direct examination. Mr. Balderama testified that he typically received a one-hour meal period while working in the calving department where he typically worked more than eleven hours per day, and gave conflicting testimony about whether he received meal periods at all when he worked in the machinery department. *See* ECF No. 846 at 49:2-50:12, 52:9-25. Mr. Balderama also testified that he received no meal periods when he left work earlier than scheduled and did not always receive a meal period on other days. *See id.* at 50:17-25, 54:14-24. Mr. Balderama did not testify that he reported meal periods not recorded on his timecards to a supervisor. On cross examination, Mr. Balderama admitted that "the minimum [lunch period] we could take was a half hour" and also admitted that he could not recollect the exact duration of his meal periods. *See id.* at 76:9-18. Mr. Balderama gave nonresponsive answers to questions about whether he preferred to waive his meal periods on days he planned to leave work early. *See id.* at 79:1-81:2. Although Mr. Balderama was evasive at times and gave answers nonresponsive to fair questions on cross examination, the court found no reason to doubt the accuracy of his timecards and awards him damages based on a review of those documents. The timecards show the following noncompliant periods:

(1) six missed meal periods on workdays lasting between five and eleven hours while claimant earned a shift rate of $129.25 equaling six half-hour noncompliant periods for damages of $48.48;

(2) eight missed meal periods on workdays lasting between five and eleven hours at $11.75 per hour equaling the same number of half-hour noncompliant periods for damages of $47.00;

(3) four meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $11.75 per hour equaling four half-hour noncompliant periods for damages of $23.50;

(4) one meal period of less than thirty minutes on a workday exceeding eleven hours at $11.75 per hour equaling two half-hour noncompliant periods for damages of $11.75;

(5) ten missed meal periods on workdays lasting between five and eleven hours at $12.50 per hour equaling the same number of half-hour noncompliant periods for damages of $62.50;

(6) one meal period of less than thirty minutes on a workday between five and eleven hours at $12.50 per hour equaling one half-hour noncompliant period for damages of $6.25;

(7) three meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $12.50 per hour equaling three half-hour noncompliant periods for damages of $18.75;

(8) sixteen missed meal periods on workdays lasting between five and eleven hours at $14.00 per hour equaling the same number of half-hour noncompliant periods for damages of $112.00;[87]

(9) ten meal periods of less than thirty minutes on workdays between five and eleven hours at $14.00 per hour equaling the same number of half-hour noncompliant period for damages of $70.00; and

(10) eight meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $14.00 per hour equaling eight half-hour noncompliant periods for damages of $56.00.

Total = $456.23

**Genaro Moreno**:  On direct examination, Mr. Moreno testified that he always took a one-hour meal period and that his timecards accurately reflect the time he clocked out for meal periods.  *See* ECF No. 848 at 109:21-110:3.  On cross examination, Mr. Moreno again conceded his ability to take meal periods.  *See id.*

---

[87]  Two time entries contain handwritten notes on days where the timecards show no meal periods.  The first, related to November 20, 2017, appears to say "Lunch Feedlot" in the area typically showing a meal period.  *See* Ex. 26 at 3603.  The second, related to December 28, 2017, simply says "lunch."  *See id.* at 3603.  The court cannot determine whether these notes are intended to convey that Mr. Balderama took a meal period on the respective days nor can the court determine the length of any meal period based on the notes.  Thus, the court construes the entries in Mr. Balderama's favor.

at 141:17-18. Neither counsel asked Mr. Moreno if he failed to report meal periods taken but not reflected on his timecards. None of Mr. Moreno's testimony indicates inaccuracy with his time reporting. Thus, the court awards him damages based on a review of those documents. The timecards show the following noncompliant periods:

(1) one meal period lasting between thirty and sixty minutes on a workday exceeding eleven hours at $14.00 per hour equaling one half-hour noncompliant period for damages of $7.00;

(2) seven missed meal periods on workdays lasting between five and eleven hours at $14.50 per hour equaling the same number of half-hour noncompliant periods for damages of $50.75;

(3) one meal period lasting between thirty and sixty minutes on a workday exceeding eleven hours at $14.50 per hour equaling one half-hour noncompliant period for damages of $7.25;

(4) three missed meal periods on workdays lasting between five and eleven hours at $15.00 per hour equaling the same number of half-hour noncompliant periods for damages of $22.50;

(5) five missed meal periods on workdays lasting between five and eleven hours at $17.00 per hour equaling the same number of half-hour noncompliant periods for damages of $42.50;

(6) one meal period of less than thirty minutes on a workday lasting between five and eleven hours at $17.00 per hour equaling one half-hour noncompliant period for damages of $8.50;

(7) two meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $17.00 per hour equaling two half-hour noncompliant period for damages of $17.00;

(8) three missed meal periods on workdays lasting between five and eleven hours at $17.25 per hour equaling the same number of half-hour noncompliant periods for damages of $25.88; and

(9) one meal period lasting between thirty and sixty minutes on a workday exceeding eleven hours at $17.25 per hour equaling one half-hour noncompliant period for damages of $8.63.

Total = $190.01

**Guadalupe Martinez Adame**:  On direct examination, Mr. Adame testified that he did not initially clock in and out for meal periods but did so later during his employment period with the dairy.  *See* ECF No. 848 at 71:17-18.  Mr. Adame gave conflicting and somewhat confusing testimony regarding whether he received his meal periods during the period before he began clocking out.  *See, e.g.*, *id.* at 73:1-5 (answering "that is true" to leading question on direct asking "was it true that [the] entire time that you did not receive a full hour of lunch during your shifts?"), 73:9-12 (answering "that is correct" to leading question on direct asking "and it's true that you didn't receive 60 minutes of lunch in each shift before in the time period you were clocking in and out for your lunches?"), 82:10 (conceding on cross that there was "always time to eat from 12 up until 1" in the period before he began clocking out for meal periods), 83:9-10 (stating on cross that "[a]t the lunch hour, we would always eat."), 84:7-8 (agreeing that he received all of his meal periods), 93:6-94:11 (conceding on redirect that "many times" he would receive sixty minute meal periods).  Mr. Adame did admit on both direct and cross examination that he was unable to estimate the number of meal periods he might have missed during the period before he began clocking out, but that his timecards are accurate after that point.  *See id.* at 82:20-83:11, 94:8-11, 95:3-9.  Due to the inconsistent, confusing, and nonresponsive nature of much of Mr. Adame's testimony, the court has no credible evidence of any noncompliant meal periods before Mr. Adame began to clock in and out for meal periods.  Plus, Mr. Adame provided no basis on which the court can calculate the number of noncompliant meal periods.  However, nothing in Mr. Adame's testimony calls into question the accuracy of his timecards.  While Mr. Adame did not provide the date on which he began clocking in and out for meal periods, the timecards show meal period entries beginning on December 16, 2016.  From and after this date, Mr. Adame's timecards show the following noncompliant periods:

(1) fourteen meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $14.00 per hour equaling fourteen half-hour noncompliant periods for damages of $98.00;

(2) 208 meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $15.50 per hour equaling the same number of half-hour noncompliant periods for damages of $1,612.00;

(3) seven meal periods of less than thirty minutes on workdays exceeding eleven hours at $15.50 per hour equaling fourteen half-hour noncompliant periods for damages of $108.50;

(4) seventy-eight meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $15.75 per hour equaling the same number of half-hour noncompliant periods for damages of $614.25;

(5) three meal periods of less than thirty minutes on workdays exceeding eleven hours at $15.75 per hour equaling six half-hour noncompliant periods for damages of $47.25; and

(6) one missed meal period on a workday lasting between five and eleven hours at $15.75 per hour equaling one half-hour noncompliant period for damages of $7.88.

Total = $2,487.88

**Hector Ibanez**: Mr. Ibanez worked exclusively in the dairy's milking department from April 19, 2016 to March 9, 2017. *See* ECF No. 846 at 5:25-6:9. Mr. Ibanez indicated that he began to clock out for meal periods toward the end of his employment with the dairy but that he did not receive any meal periods before that time. *See id.* at 10:18-12:8. However, on direct examination Mr. Ibanez conceded that he would hide in order to take meal periods. *See id.* at 12:13-24. On cross examination, Mr. Ibanez confirmed that he "would go hide to eat some food" and that he "did that without punching out" but that he had no records to show the frequency or duration of these breaks. *See id.* at 20:17-21. Mr. Ibanez also conceded that before the period he began clocking out for meal periods he would alternate lunches with a coworker during the day and that sometimes he would have a meal in the milk barn with up to three coworkers. *See id.* at 21:22-22:3. Mr. Ibanez also conceded that, during the same period, he sometimes ate meals at a table near the timeclock, but he had no records of the frequency or duration of these instances. *See id.* at 22:24-23:14. Mr. Ibanez further testified that he and his coworkers were able to break for meal periods while the milking line went down for the daily cleaning, which took about forty minutes. *See id.* at 23:15-24:3. Mr. Ibanez confirmed that he had no way to calculate the duration or frequency of his informal meal periods before the time he began recording them. *See, e.g., id.* at

27:14-16.  On redirect, Mr. Ibanez stated that his informal meal periods lasted less than thirty minutes and that he sometimes ate at the table near the timeclock during the equipment cleaning process but confirmed that he "would take a lunch break when . . . the line was clean[ed]" and that "while the line was being cleaned, we would eat."  *See id.* at 31:19-32:24.  After several leading questions from his counsel apparently intended to solicit a different answer, Mr. Ibanez reversed course by responding "wait, wait . . . I just remembered I was also working . . . continuing to clean stalls" as well as "change filters" and "fetch cows" during the milking line downtime.  *See id.* at 32:21-33:13.  During recross, Mr. Ibanez admitted that he was "not able to recall quite well" the days when he was able to take breaks and meal periods.  *See id.* at 36:14-18.  Mr. Ibanez could not explain why he testified during his deposition that he took thirty-minute meal periods during the milk line wash cycle and spent the remaining ten minutes working.  *See id.* at 38:1-39:12.  Finally, Mr. Ibanez testified that he failed to recall when he started taking meal periods.  *See id.* at 36:23-37:10.

In light of these various unexplained discrepancies, the court is unable to give any weight to Mr. Ibanez's testimony that he received no compliant meal periods before the period in which he began recording these events.  The court will award damages based on the timecards from the date those records reflect a consistent recording of these periods.[88]  These records reflect the following noncompliant meal periods:

(1) sixteen meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling sixteen half-hour noncompliant periods for damages of $115.00.

Total = $115.00

**Jesus Gallegos**: Mr. Gallegos began working for the dairy as a milking employee from September 14, 2016 through February 22, 2017, before transferring to other areas of the dairy.  *See* Ex. 32, ECF No. 844 at 77:3-8.  During his testimony, Mr. Gallegos touched very little on his meal periods as a milking employee.  In that capacity, he testified on direct that he clocked out for meal periods of ten minutes but never received thirty minutes.  *See id.* at 81:19-82:7.  Mr. Gallegos did not provide any basis for these truncated meal periods.  On cross examination, he

---

[88]  The timecards reflect that Mr. Ibanez began recording his meal periods on November 16, 2016, though there are a few logged meal periods before this date.  The court will not consider anything prior to this date even if reflected on the timecards because Mr. Ibanez's testimony brings into doubt the accuracy of any records before consistent logging of meal periods.

testified that he had no verification of the frequency or duration of the meal periods he was able to take prior to the date that the dairy required milking employees to clock out for meal periods. *See id.* at 93:11-19. Mr. Gallegos testified that, after transferring to the maternity department, he sometimes clocked out for meal periods, spent thirty to forty minutes eating, worked the remainder of the meal period, then clocked out at the end of the hour under the direction of his "foreman." *See id.* at 82:11-83:15; *see also* 92:20-25 ("*They* would make us work even though we were on our lunch-hour"). Mr. Gallegos did not identify the foreman at issue or the individuals he referred to as "they." He did concede on cross examination that he has no records or methods to calculate the number of noncompliant meal periods. *See id.* at 93:5-19. Otherwise, Mr. Gallegos conceded that he typically received a meal period – though not always of the compliant durations – and that he would always clock out for those periods. *See id.* at 82:8-10, 83:21-84:4.

The court will not award Mr. Gallegos damages for his time in the maternity department when he testified that clocked out for meal periods but continued to work. First, the court finds Mr. Gallegos' testimony on the matter implausible. Other than one other claimant whom the court found unbelievable, Mr. Gallegos' testimony on the matter is unique among, and inconsistent with, his fellow claimants. Further, Mr. Gallegos' timecards do not readily support his testimony on this matter. In the end, there is simply no other evidence supporting the self-serving testimony and credible evidence to the contrary. Second, the court cannot rely on Mr. Gallegos' timecards during this period, even if the court found Mr. Gallegos' testimony on the subject credible, since he affirmatively testified that the timecards are inaccurate and conceded he has no way to determine the number or duration of any of the alleged noncompliant periods. Thus, any damage calculations would be based entirely on speculation. For these reasons, the court finds Mr. Gallegos has not met his prima facie burden to show he is entitled to damages during his time in maternity which he alleges is between February 23, 2017 through April 15, 2018. *See* ECF No. 852 at 18:1-2. The credibility issues, the speculative nature of the claims, and the failure to allege a basis for missed meal periods as a milking employee also weigh against awarding damages for the allegedly missed meal periods before the date he began recording meal periods in that capacity. Though not entirely credible, Mr. Gallegos' testimony did not negate the accuracy of the entries logged on his timecards outside his time in the

maternity department. As such, the court awards damages based on a review of these documents.[89] The timecards show the following noncompliant periods:

(1) one meal period lasting between thirty and sixty minutes on a workday lasting between five and eleven hours while claimant earned $100.00 per shift equaling a half-hour noncompliant period for damages of $6.25;

(2) eighty-one meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling eighty-one half-hour noncompliant periods for damages of $582.39;

(3) twenty-two meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $14.50 per hour equaling the same number of half-hour noncompliant periods for damages of $159.50; and

(4) one meal period of less than thirty minutes on a workday exceeding eleven hours at $14.50 per hour equaling two half-hour noncompliant periods for damages of $29.00.

Total = $777.14

**Jesus Gaona**: Mr. Gaona worked exclusively in the dairy's milking department from May 8, 2017 through June 16, 2017. *See* Ex. 35. Since Mr. Gaona was unavailable to testify, the only evidence of noncompliant meal periods comes from the dairy's timecards admitted as Exhibit 25, which appear to record all his meal periods. As such, the court will award damages based on these documents which reflect the following noncompliant periods:

(1) sixteen meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $100.00 per shift equaling sixteen half-hour noncompliant periods for damages of $100.00; and

(2) three meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling three half-hour noncompliant periods for damages of $21.57.

Total = $121.57

---

[89] While Mr. Gallegos did not provide a date on which he began clocking out for meal periods while a milking employee, his timecards reflect that this occurred on approximately October 8, 2016. Thus, the court will assess any damages beginning on this date.

**Joaquin Mendoza**: Mr. Mendoza testified that he worked for the dairy during the entire claims period as both an outside employee and as a milking employee. *See* ECF No. 844 at 5:11-19. While Mr. Mendoza did not provide the exact dates he worked as a milking employee, his timecards indicate September 15, 2015 through January 6, 2016. *See* Ex. 34. This period preceded the date on which the dairy began requiring milking employees to record meal periods. Mr. Mendoza testified that he received no meal periods as a milking employee. *See* ECF No. 844 at 13:9-13. Mr. Mendoza did not explain the basis for the allegedly missed meal periods. On cross examination, Mr. Mendoza conceded that the dairy forced him to take meal periods during his entire employment. *See id.* 19:19-24, 21:9-17. And, when shown inconsistencies between his deposition and trial testimony, Mr. Mendoza conceded specifically that "[t]here in the milking, you know, in the dairy, they would at least give us, you know, a break and the lunch." *See id.* 28:5-7. On redirect, Mr. Mendoza again insisted that he did not receive meal periods as a milking employee. *See id.* at 39:14-25. Again, he did not explain why. In his capacity as an outside employee, Mr. Mendoza testified that he clocked out for meal periods and received one hour for each period per the dairy's policy. *See* ECF No. 844 at 10:4-5, 11:1-23, 12:9-16, 14:14-19, 19:15-24, 20:9-17, 21:9-17. Mr. Mendoza testified on direct that he received no meal periods while working in the machinery department but then oddly reversed the testimony while still on direct without explanation. *See id.* at 11:1-8, 14:1-19, 39:5-9. On cross examination, Mr. Mendoza conceded that the dairy, per its policy, required him to take meal periods during the entirety of his employment. *See id.* at 19:19-24, 21:9-17.

Due to the several internal inconsistencies in his trial testimony, the unexplained inconsistencies between it and his deposition testimony, and his failure to allege a basis for any missed meal periods, the court cannot rely on Mr. Mendoza's testimony as evidence that he missed meal periods as a milking employee when those periods were not recorded. However, although Mr. Mendoza does not allege that the debtors systematically denied him meal periods, the court awards the following damages based on the following noncompliant periods reflected in Mr. Mendoza's timecards:

(1) twenty-two missed meal periods on workdays lasting between five and eleven hours at $11.00 per hour equaling twenty-two half-hour noncompliant periods for damages of $121.00;

(2) one meal period of less than thirty minutes on a workday lasting between five and eleven hours at $11.00 per hour equaling one half-hour noncompliant period for damages of $5.50;

(3) one meal period lasting between thirty and sixty minutes on a workday exceeding eleven hours at $11.00 per hour equaling one half-hour noncompliant period for damages of $5.50;

(4) one missed meal period on a workday lasting between five and eleven hours at $10.50 per hour equaling one half-hour noncompliant period for damages of $5.25;

(5) five meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $10.50 per hour equaling five half-hour noncompliant period for damages of $26.25;

(6) thirty-eight missed meal periods on workdays lasting between five and eleven hours at $14.00 per hour equaling thirty-eight half-hour noncompliant periods for damages of $266.00;

(7) twenty-four meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $14.00 per hour equaling twenty-four half-hour noncompliant period for damages of $168.00;

(8) seven meal periods of less than thirty minutes on workdays lasting between five and eleven hours at $14.00 per hour equaling seven half-hour noncompliant period for damages of $49.00; and

(9) one meal period of less than thirty minutes on a workday exceeding eleven hours at $14.00 per hour equaling two half-hour noncompliant periods for damages of $14.00.

Total = $660.50

**Jorge Ramirez**: Mr. Ramirez worked as a shift lead in the dairy's milking department from the beginning of the claims period until June 20, 2016, before transferring to other areas of the dairy. *See* Ex. 18, ECF No. 849 at 100:18-101:17. As a milking employee, Mr. Ramirez testified that he "never had lunchtimes" or received a thirty-minute meal period. *See id.* at 122:6-8. Mr. Ramirez did not specify on direct the reason for his lack of meal periods. On cross examination, Mr. Ramirez declared he didn't stop working for meal periods because "the people

in charge didn't make it clear that it was our responsibility to get breaks or lunches . . . we were never told" and that "the supervisors were [never] like, Hey, you know, you guys need to take your lunch." *See id.* at 168:14-18. This testimony indicates that Mr. Ramirez understood that he needed express permission from a supervisor to take a meal period not that he was denied these periods. Mr. Ramirez also conceded that the milking line underwent cleaning which stopped milking work for thirty to forty minutes twice a day but testified on recross that he had some duties of undefined duration during these cleaning cycles. *See id.* at 179:19-181:6. Mr. Ramirez also testified that, during his time as an outside employee, he clocked out for meal periods and always received at least thirty to sixty minute scheduled meal periods. *See* ECF No. 849 at 128:4-130:18, 177:14-16. Mr. Ramirez finally testified that sometimes he did not clock out for meal periods when he worked in areas remote from the time clock but that he did take a meal period during those instances. *See id.* at 128:4-10.

Mr. Ramirez's time in the milking department precedes the dates when milking employees recorded their meal periods, thus, the court would necessarily have to rely on Mr. Ramirez's testimony to award damages. While the court finds Mr. Ramirez genuine, his testimony that he "never" received a meal period during his entire milking tenure is of little value. First, it is simply overbroad and lacks any detail. And second, he fails to allege the reasons for the missed meal periods. Further, as discussed in detail later, Mr. Ramirez credibly testified that he received all compliant meal periods as an outside employee when those periods were recorded on his timecards. Interestingly, Mr. Ramirez's memory appears largely, but not entirely, accurate. While assessing the timecard entries, the court found that Mr. Ramirez did not receive all compliant meal periods contrary to his memory.[90] The court takes these inaccuracies into account here and concludes that his testimony is not a sufficient basis to award damages for any alleged noncompliant periods during his time as a milking employee. The court awards the following damages based on Mr. Ramirez's timecards:

(1) twenty-two missed meal periods on workdays lasting between five and eleven hours at $12.00 per hour equaling twenty-two half-hour noncompliant periods for damages of $132.00;

---

[90] This is one of several examples of the inconsistency between a claimant's memory and contemporaneous documentation, again highlighting the imprudence of relying on memory when considering the claimants' testimony related to rest and meal periods.

(2) one meal period of less than thirty minutes on a workday lasting between five and eleven hours at $12.00 per hour equaling one half-hour noncompliant period for damages of $6.00;

(3) forty-four missed meal periods on workdays exceeding eleven hours at $12.00 per hour equaling twice the number of half-hour noncompliant periods for damages of $528.00;[91]

(4) six missed meal periods on workdays lasting between five and eleven hours at $13.00 per hour equaling six half-hour noncompliant periods for damages of $39.00;

(5) seven meal periods of less than thirty minutes on workdays lasting between five and eleven hours at $13.00 per hour equaling seven half-hour noncompliant periods for damages of $45.50;

(6) seven meal periods of less than sixty minutes on workdays exceeding eleven hours at $13.00 per hour equaling seven half-hour noncompliant period for damages of $45.50;

(7) one meal period of less than thirty minutes on a workday exceeding eleven hours at $13.00 per hour equaling two half-hour noncompliant periods for damages of $13.00;

(8) three missed meal periods on workdays lasting between five and eleven hours at $13.50 per hour equaling three half-hour noncompliant periods for damages of $20.25;

(9) one meal period of less than thirty minutes on a workday lasting between five and eleven hours at $13.50 per hour equaling one half-hour noncompliant period for damages of $6.75;

---

[91]    Mr. Ramirez's timecards show no meal periods taken continuously between June 21, 2016 through August 19, 2016.  *See* Ex. 18 at 4048-4052.  These missed meal periods represent the overwhelming majority of those tallied in paragraph (1) and (3).  Mr. Ramirez testified that, during this timeframe, he worked remotely from the timeclock and could not punch out for meal periods that he admittedly took.  The court suspects that the timecards simply were not corrected to account for the meal periods actually taken but not recorded rather than that Mr. Ramirez actually missed all his meal periods.  If this is the case, Mr. Ramirez received paid meal periods to which he was not entitled.

**MEMORANDUM DECISION**                    Page 60

(10) ten meal periods between thirty and sixty minutes on workdays exceeding eleven hours at $13.50 per hour equaling ten half-hour noncompliant period for damages of $67.50; and

(11) one meal period of less than thirty minutes on a workday exceeding eleven hours at $13.50 per hour equaling two half-hour noncompliant periods for damages of $13.50.

Total = $917.00

**Jorge Ramos**: Mr. Ramos worked solely as a milking employee during his entire time at the dairy, starting from prior to the claims period in 2014 and ending on November 14, 2017. *See* Ex. 35; Ex. 55 at 11:4-12:20. The great majority of Mr. Ramos' time at the dairy apparently preceded the period in which the dairy began to require milking employees to clock out for meal periods, so his timecards do not reflect the date or duration of these meal periods. Mr. Ramos testified that he received meal periods during only one milking shift (the afternoon shift) when the machines were down for their wash cycle. *See* Ex. 55 at 29:2-10. However, he testified that these meal periods lasted only fifteen to twenty minutes. *See id.* at 29:18-23. Mr. Ramos also testified that he received full thirty-minute meal periods starting on an unidentified date in 2017 when the dairy changed its policy to ensure employees took their meal periods. *See id.* at 35:21-36:6. Finally, Mr. Ramos conceded that his memory of the events and period in question may not be entirely accurate because "[i]t's been a while that all this happened." *See id.* at 10:6-9.

While Mr. Ramos' testimony appears genuine, it does not support his meal period claims. Critically, Mr. Ramos did not allege that the dairy, or any authority figure there, denied or discouraged meal periods. Further, Mr. Ramos' testimony that the milking line underwent cleaning only once per day conflicts with the testimony of other claimants and dairy personnel who testified that this occurred twice per day. His recollection of the ability to take meal periods during this downtime also conflicts with the testimony of other employees who conceded their ability to do so. Further, Mr. Ramos denied ever being given the opportunity to review his time records (save a single instance), but his own counsel successfully sought admission of several bearing Mr. Ramos' signature. *See id.* at 54:13-55:7, Ex. 35 at 4149-4150. Based on these and other inconsistencies in Mr. Ramos' testimony and his inability to remember other details,[92] along with his admission that the events are not fresh in his mind, the court finds Mr. Ramos' memory an insufficient basis on

---

[92]    *See* pp. 26-27 *supra* (discussion regarding Mr. Ramos' rest-break claim).

**MEMORANDUM DECISION**          Page 61

which to award damages for allegedly missed meal periods not reflected on his timecards. Thus, the court awards damages based on the noncompliant periods reflected in the timecards starting from the date those records reflect a consistent recording of these periods.[93] These documents reflect the following noncompliant meal periods:

(1) three meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling three half-hour noncompliant periods for damages of $21.57;

(2) one missed meal period on a workday lasting between five and eleven hours while claimant earned $115.00 per shift equaling a half-hour noncompliant periods for damages of $7.19;

(3) seventy-eight meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $120.00 per shift equaling the same number of half-hour noncompliant periods for damages of $585.00;

(4) sixteen missed meal periods on workdays lasting between five and eleven hours while claimant earned $120.00 per shift equaling sixteen half-hour noncompliant periods for damages of $120.00;

(5) forty meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $125.00 per shift equaling the same number of half-hour noncompliant periods for damages of $312.60; and

(6) thirteen missed meal periods on workdays lasting between five and eleven hours while claimant earned $125.00 per shift equaling thirteen half-hour noncompliant periods for damages of $101.60.

Total = $1,147.96

**Jose Esquivel**: On direct examination, Mr. Esquivel testified that he did not initially clock in and out for meal periods until sometime "[t]owards the last month" of his employment when a "person in charge" directed him to "punch . . . about half an hour to 45 minutes so we can have . . . a record of the lunch hour." *See* ECF No. 844 at 49:2-4, 49:25-7, 50:8-9, 50:6-14, 54:19-22. Mr. Esquivel also testified that he attempted to utilize these periods to eat but that the person in

---

[93]    The timecards reflect Mr. Ramos began recording his meal periods on October 7, 2016. *See* Ex. 35 at 4130.

charge discouraged the practice. *See id.* at 51:15-21, 52:8-15. Mr. Esquivel further testified that before the period in which he began recording meal periods, he was not permitted such periods. *See id.* at 49:2-16, 54:19-55:6. On cross examination, Mr. Esquivel conceded that he was able to leave the premises at least once during a meal period during which he clocked out. *See id.* at 60:21-61:8. While Mr. Esquivel testified that he could not take meal periods during his day shifts for fear of reprimand, he testified that he could not take meal periods during his night shifts when he worked alone due to a more demanding workload at night. *See id.* 65:13-66:1. Mr. Esquivel did not directly or satisfactorily address questioning attempting to determine why the workload proved more demanding at night. *See id.* 66:4-13. Mr. Esquivel also did not specify when he began recording meal periods, but his timecards show the documentation began in December 2016 – well before the general date Mr. Esquivel identified. *See* Ex. 37 at 4245. After this period, Mr. Esquivel's timecards show several noncompliant periods. *See id.* at 4245-4257.

The court finds that Mr. Esquivel's testimony lacks credibility. First, as noted above, Mr. Esquivel testified that his timecards are inaccurate because the "person in charge" required him to clock out for thirty to forty-five minutes while working during that time. This testimony conflicts with the timecards. The timecards show that a significant number of unrecorded meal periods, periods of less than compliant length, and ones that equaled or exceeded an hour. *See, e.g., id.* at 4248 (entries for January 9, 2017 through January 11, 2017, showing meal periods of an hour or more same and entries for January 12, 2017, January 14, 2017, and January 15, 2017 all showing missed meal periods). So, Mr. Esquivel's testimony does not line up with his timecards. Further, many of the missed or noncompliant meal periods occurred during the day shift when a supervisor would have been present to direct Mr. Esquivel to clock out. *See, e.g., id.* This inconsistency indicates either that Mr. Esquivel did not comply with any demands to clock out or that there were no such demands. Either way, again his testimony does not mesh with his timecards. The court does not speculate whether these inconsistencies resulted from memory lapses or other factors, but ultimately cannot rely on any of the largely self-serving testimony or the timecards that Mr. Esquivel insists are inaccurate. Finally, due to the unreliable nature of the timecards and the absence of any alternative means to reliably calculate any noncompliant meal periods, any damage calculation would be based entirely on speculation. Thus, Mr. Esquivel has not met his prima facie case and is awarded no damages on his meal-period claims.

**Jose Martinez**: Mr. Martinez testified that he used the timeclock to record the beginning and end of his shifts during the claims period but that he clocked out for

meal periods only "[o]n occasions." *See* ECF No. 850 at 14:17-19. Despite efforts from his attorney to elicit a different answer, Mr. Martinez repeatedly and unequivocally testified that he received at least thirty minutes for a meal period each shift. *See id.* at 16:18-20, 17:1-19; *see also* 33:23-34:18 (avoiding answering the question directly on cross examination but finally conceding that he received a meal period every shift during his employment with the dairy). He testified that he often worked eleven hours or more but only occasionally received meal periods of sixty minutes due to a heavy workload. *See id.* at 7:1-20, 17:22-18:6, 19:6-11. Mr. Martinez also testified that there was not a designated lunch time and that he took meal periods at his own discretion. *See id.* at 16:24-17:3, 34:19-35:2.

Mr. Martinez did not testify that the dairy or its authorized agents denied Mr. Martinez compliant meal periods. While the court does not find Mr. Martinez's testimony generally credible due to the evasive and nonresponsive nature of his answers, his testimony related to meal periods appears sufficiently consistent to rely on his timecards with a few caveats. The timecards show that Mr. Martinez did not clock out for meal periods more often than not, which is consistent with his testimony that he only "occasionally" clocked out for meal periods he actually took.[94] As such, the court cannot rely on the absence of a time entry as evidence that Mr. Martinez failed to receive a meal period. Further, due to Mr. Martinez's ready and repetitious answers on the matter, the court found credible Mr. Martinez's testimony that he received at least thirty minutes for a meal period each shift. Thus, the court cannot rely on conflicting entries in the timecards. Further, Mr. Martinez's testimony that he could take, and apparently even clock out for, meal periods at his discretion eliminates any evidentiary value of any time entries indicating that Mr. Martinez failed to receive at least a thirty-minute meal period in any given shift. However, Mr. Martinez testified that he only "occasionally" received sixty-minute meal periods during longer shifts. *See id.* at 17:22-18:1, 19:9-11. Thus, the court will award damages of thirty minutes for any time entry showing Mr. Martinez failed to receive at least sixty minutes for a meal period on workdays exceeding eleven hours. His timecards show the following of these noncompliant periods:

(1) eleven meal periods of less than sixty minutes on workdays exceeding eleven hours at $15.75 per hour equaling the same number of half-hour noncompliant period for damages of $86.63;

---

[94] Because Mr. Martinez only "occasionally" clocked out for meal periods, the court notes that this necessarily means that he received paid meal periods to which he was not entitled. Because the debtors have not asked for such relief, and because there are no factual bases to calculate the number of such meal periods, the court will not offset the damage award by the paid meal periods.

(2) 221 meal periods of less than sixty minutes on workdays exceeding eleven hours at $16.00 per hour equaling the same number of half-hour noncompliant period for damages of $1,768.00; and

(3) 103 meal periods of less than sixty minutes on workdays exceeding eleven hours at $16.50 per hour equaling the same number of half-hour noncompliant period for damages of $849.75.

Total = $2,704.38

**Jose Noel Ceja**:  On direct examination, Mr. Ceja provided no testimony of any significance related to his meal period claim.  *See* ECF No. 848 at 165:16-166:12.  On cross examination, Mr. Ceja conceded that the dairy provided him meal periods of unspecified length during his employment.  *See id.* at 181:15-22.  Mr. Ceja also testified that he never worked eleven hours or more in 2017 and worked eleven hours or more approximately four days per month in 2018.  *See id.* 194:2-23.  While this assertion conflicts with Mr. Ceja's timecards, the testimony generally does not discredit these records which show the following noncompliant meal periods:

(1) two meal periods between thirty and sixty minutes on workdays exceeding eleven hours at $12.00 per hour equaling two half-hour noncompliant periods for damages of $12.00;

(2) twelve missed meal periods on workdays lasting between five and eleven hours at $14.00 per hour equaling twelve half-hour noncompliant periods for damages of $84.00;

(3) one meal period of less than thirty minutes on a workday lasting between five and eleven hours at $14.00 per hour equaling one half-hour noncompliant period for damages of $7.00; and

(4) one meal period between thirty and sixty minutes on a workday exceeding eleven hours at $14.00 per hour equaling one half-hour noncompliant period for damages of $7.00.

Total = $110.00

**Juan Macedo**: Mr. Macedo worked in the dairy's hospital department from June 6, 2015 through October 10, 2016.  *See* Ex. 41.  Mr. Macedo was unavailable to

testify, so the court awards damages based on the dairy's time records admitted as Exhibit 41. These documents show the following noncompliant periods:

(1) five meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $13.00 per hour equaling five half-hour noncompliant periods for damages of $32.25;

(2) one meal period of less than thirty minutes on a workday exceeding eleven hours at $13.00 per hour equaling two half-hour noncompliant periods for damages of $13.00;

(3) 102 missed meal periods on workdays lasting between five and eleven hours at $13.00 per hour equaling the same number of half-hour noncompliant periods for damages of $663.00;

(4) twenty missed meal periods on workdays exceeding eleven hours at $13.00 per hour equaling twice the number of half-hour noncompliant periods for damages of $260.00;

(5) ninety-two missed meal periods on workdays lasting between five and eleven hours at $13.25 per hour equaling the same number of half-hour noncompliant periods for damages of $609.50;

(6) twenty-one missed meal periods on workdays exceeding eleven hours at $13.25 per hour equaling twice the number of half-hour noncompliant periods for damages of $278.25;

(7) eighty-six missed meal periods on workdays lasting between five and eleven hours at $14.00 per hour equaling the same number of half-hour noncompliant periods for damages of $602.00; and

(8) thirty-nine missed meal periods on workdays exceeding eleven hours at $14.00 per hour equaling twice the number of half-hour noncompliant periods for damages of $546.00.

Total = $3,004.00

**Maria Cuenca**: Ms. Cuenca worked solely as a milking employee during her approximate three-month stint at the dairy in 2017. *See* Ex. 44; Ex. 56 at 11:23-12:10, 13:4-15. Contrary to her husband's testimony (who she worked with daily)

Ms. Cuenca testified that she received a meal period every shift when she was able to sit uninterrupted and eat – though she testified her husband who was the supervisor limited this period to fifteen minutes. *See* Ex. 56 at 30:7-31:6. She further testified that milking employees would receive a warning meal periods longer than fifteen minutes but that she never witnessed such an event. *See id.* at 31:15-25. Ms. Cuenca further testified that the meal periods were later extended to twenty minutes about a month after her start date by an unidentified person, then eventually to thirty minutes. *See id.* at 35:5-16. Contrary to the testimony of other claimants, Ms. Cuenca also testified that neither she nor other employees were free to eat during the wash cycle of the milking line and, uniquely, testified that dairy management specifically prohibited eating during this time. *See id.* at 36:1-16. Ms. Cuenca did concede that, during her time supervising all three milking shifts, she instructed the milking employees to take thirty-minute meal periods. *See id.* at 37:22-38:1. In somewhat odd contrast to prior testimony, Ms. Cuenca testified milking employees "got hungry after the lunch" so she would see them eating among the cows. *See id.* at 39:4-7. It seems this is a tacit admission that milking employees received some sort of meal period. Finally, Ms. Cuenca testified "I would have to guess" at the number of noncompliant meal periods. *See id.* at 45:13-18. While Ms. Cuenca's testimony contains some inconsistencies, it does not discredit the accuracy of her timecards. As such, the court will award damages based on these documents which show the following noncompliant periods:

(1) twenty-seven meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $100.00 per shift equaling the same number of half-hour noncompliant periods for damages of $168.75;

(2) forty-nine meal periods of less than thirty minutes on workdays lasting between five and eleven hours while claimant earned $115.00 per shift equaling the same number of half-hour noncompliant periods for damages of $361.38; and

(3) two missed meal periods on workdays lasting between five and eleven hours at $15.00 per hour equaling two half-hour noncompliant periods for damages of $15.00.

Total = $545.13

**Maria Guadalupe Georgina Velasquez**: Ms. Velasquez worked exclusively in the dairy's milking department during only the first pay period in March 2018. *See* Ex. 44, ECF No. 843 at 6:6-9. Ms. Velasquez testified that she clocked in and out for meal periods and that she received thirty minutes to eat. *See id.* at 9:20-23,

15:22-16:15, 19:14-15. When asked about a specific instance where her timecards reflected that she received only twenty-four minutes for a meal period, Ms. Velasquez testified that "[w]ell it was half an hour . . . [s]ometimes we would, you know clock in a little bit earlier." *See id.* at 16:6-15. Ms. Velasquez did not testify that the dairy denied her compliant meal periods, nor does she claim damages for any such violations. *See* ECF No. 852 at 28:8-20. As such, the court awards no damages.

**Maria Ochoa**: Ms. Ochoa began her employment with the dairy as an outside employee then moved to the milking department from January 8, 2016 until March 16, 2016. *See* Ex. 43, ECF No. 846 at 117:15-17. Ms. Ochoa testified that she received approximately fifteen minutes for meal periods during her time as a milking employee but did not receive thirty minutes due to time constraints. *See id.* 122:5-123:2. Ms. Ochoa did not testify that the dairy or its authorized agent discouraged meal periods. In her capacity as an outside employee, Ms. Ochoa testified that she regularly received meal periods of fifty minutes, that the designated meal period was from noon to one, and that she clocked out during these periods. *See id.* at 119:15-20, 120:4-21. Finally, Ms. Ochoa testified that she did not always receive a meal period of at least sixty minutes on workdays exceeding eleven hours. *See id.* at 121:22-24. Because Ms. Ochoa's time in the milking department preceded the date those employees began recording meal periods, the court must rely on Ms. Ochoa's testimony alone to award damages for this time. Because Ms. Ochoa did not testify that the actions of the dairy or an authorized agent prevented her from taking meal periods, testified that she received meal periods of some duration, and provided no basis to determine the actual duration or frequency of those meal periods, the court cannot award damages for noncompliant meal periods during Ms. Ochoa's time in the milking department, which occurred prior to the date milking employees began to clock in and out for meal periods. In relation to Ms. Ochoa's time as an outside employee, aside from the duration of the meal periods, her testimony is reasonably consistent with the timecards. As such, the court awards damages based on these entries. The records show the following noncompliant meal periods:

 (1) five meal periods lasting between thirty and sixty minutes on workdays exceeding eleven hours at $10.50 per hour equaling five half-hour noncompliant period for damages of $26.25; and

(2) two missed meal periods on workdays lasting between five and eleven hours at $10.50 per hour equaling two half-hour noncompliant periods for damages of $10.50.

<u>Total</u> = $36.75

**Raul Vasquez**: Mr. Vasquez worked exclusively in the dairy's milking department from the beginning of the claims period through May 22, 2016. *See* Ex. 13, ECF No. 849 at 5:6-7, 6:2-10. On direct, Mr. Vasquez testified that he did not receive thirty minutes to eat during his time with the dairy. *See id.* at 16:24-17:9. Mr. Vasquez did not address the reason for this lack of meal periods. Mr. Vasquez also conceded that the milking line underwent cleaning which stopped milking work for approximately thirty minutes "give or take" twice a day. *See id.* at 33:25-35:16. Mr. Vasquez testified that, during his time as a shift lead, he would have to reset the machine if it stopped during its wash cycle and had other undefined duties. *See id.* at 35:17-24, 48:25-49:5. However, he did concede that he would use the downtime as a meal period given the opportunity but that he "would just be guessing" as to the frequency or duration of such opportunities. *See id.* at 40:9-41:5. Mr. Vasquez's time in the milking department preceded the time in which the dairy began requiring milking employees to record their meal periods, so the court would necessarily have to rely on Mr. Vasquez's testimony to award damages. While the court finds Mr. Vasquez genuine, his testimony that he simply failed to receive any compliant meal periods during his entire milking tenure is of little value. First, it is simply overbroad and lacks any detail at all. And second, Mr. Vasquez fails to allege the reasons for the missed meal periods. Finally, Mr. Vasquez's testimony indicates that he did receive meal periods of unknown quantity and time, thus any calculation of damages would be entirely speculative. For these reasons, the court awards Mr. Vasquez no damages on his meal-period claim.

**Victor Licona**: The court finds the whole of Mr. Victor Lincona's testimony not credible. His answers were often nonresponsive to questions and just as often bizarre, confusing, and downright nonsensical.[95] Mr. Licona was also extremely and doggedly evasive during cross examination. The only testimony related to meal periods the court finds reliable is Mr. Licona's statements that he could not always clock out for a meal period for unexplained reasons but that he notified the dairy of these instances so they could be noted on his timecards. *See* ECF No. 842 at 26:22-27:3. Other than this, the court gives no weight to Mr. Licona's testimony

---

[95]   For example, when Mr. Licona's counsel asked, "did you usually receive at least 30 minutes for lunch break in your shifts?," Mr. Licona responded: "Okay. We would use the punch machine to take our lunch." *See* ECF No. 842 at 27:9-12. And when debtors' counsel asked what duties Mr. Licona had while ***walking*** to the time clock, Mr. Licona answered: "The duties were to check the car." *See id.* at 35:14-16. And when counsel repeated the question, Mr. Licona testified the duties were to "make sure we don't run over anyone . . . that we drive slowly, not to go very fast." *Id.* at 35:17-24.

and will rely on his timecards to determine any noncompliant meal periods as the testimony did not specifically undermine these records.  The documents show the following noncompliant periods:

(1) five missed meal periods on workdays lasting between five and eleven hours at $15.50 per hour equaling five half-hour noncompliant periods for damages of $77.50;

(2) four meal periods of less than thirty minutes on workdays lasting between five and eleven hours at $15.50 per hour equaling four half-hour noncompliant periods for damages of $31.00;

(3) five meal periods between thirty and sixty minutes on workdays exceeding eleven hours at $15.50 per hour equaling five half-hour noncompliant period for damages of $77.50;

(4) seven missed meal periods on workdays lasting between five and eleven hours at $16.00 per hour equaling seven half-hour noncompliant periods for damages of $56.00;

(5) nine meal periods of less than thirty minutes on workdays lasting between five and eleven hours at $16.00 per hour equaling nine half-hour noncompliant periods for damages of $72.00;

(6) three meal periods between thirty and sixty minutes on workdays exceeding eleven hours at $16.00 per hour equaling three half-hour noncompliant period for damages of $24.00;

(7) three meal periods of less than thirty minutes on workdays exceeding eleven hours at $16.00 per hour equaling six half-hour noncompliant periods for damages of $48.00;

(8) nine missed meal periods on workdays lasting between five and eleven hours at $17.50 per hour equaling nine half-hour noncompliant periods for damages of $78.75;

(9) eleven meal periods of less than thirty minutes on workdays lasting between five and eleven hours at $17.50 per hour equaling eleven half-hour noncompliant periods for damages of $96.25;

(10) twenty-one meal periods between thirty and sixty minutes on workdays exceeding eleven hours at $17.50 per hour equaling twenty-one half-hour noncompliant periods for damages of $183.75; and

(11) one missed meal period on a workday exceeding eleven hours at $17.50 per hour equaling two half-hour noncompliant periods for damages of $17.50.

Total = $762.25

### *Additional Wages for Milking Work*

  I.  <u>Milking work in excess of eight hours</u>

   In addition to the claims asserted above, those claimants who worked as milking employees assert that they are entitled to wages for any time they worked beyond eight hours in the milking department as shown on their timecards.[96] This contention hinges on a misreading of the employment agreement and a misconstruction of the basic nature of the employment relationship.

   In a paragraph entitled "**<u>Compensation</u>**", the standard form setting forth the terms of the employment relationship between the dairy and each milking employee included a blank space preserved for a handwritten rate immediately followed by an instruction to indicate whether the rate applied by the hour or the day (the line appeared as follows: "Your starting pay will be $\_\_\_\_ per hour/day (circle one)").[97] There is no dispute that "day" was circled on each agreement at issue here, indicating that the handwritten rate corresponded to what the parties refer to as a "shift rate." In the following section entitled "**<u>Shift Responsibility</u>**", the employment agreement shows that milking occurred twenty-four hours a day in

---

[96]  Claimants also allege that delays at the end of a shift delayed the start of the following shift and contend that "such 'waiting time' would constitute compensable 'hours worked.'" *See* ECF No. 851 at 33:16-19. If the court agreed, claimants present insufficient information, provide no methodology, and point to no evidence that would allow the court to reasonably estimate the frequency or duration of any alleged delays to calculate damages. Further, as mentioned previously, counsel's declaration refers only to broad categories of theories for damages (again, "pre-shift work" appears to describe both travel time and wait time but fails to distinguish the damages attributable to either). As such, the court is uncertain about whether claimants actually seek damages on this theory or simply point it out to bolster their general allegations of mistreatment. If the former, because claimants' briefing does not identify which claimants seek redress on this basis or identify a way to calculate damages, the court declines to award damages. If the latter, the court concludes the allegations are immaterial to claimants' other theories.

[97]  *See, e.g.*, Exs. 12 at 1, 14 at 1.

three eight-hour periods or "shifts" (hence the term "shift rate").[98]  In the same section, the milking agreement explains: "You are expected to complete . . . the milking of the cows for your shift . . . ***within the hours designated above for each shift.***  However, if the cows are to be milked during your shift are not milked for any reason then you are expected to remain after the hour your shift ends and complete the milking of cows for your shift ***without additional compensation***."[99]

Based on the terms of the agreement, management and supervisory employees at the dairy testified that milking employees were compensated for milking a certain number of cows rather than paid for segments of time.[100] Rationally, claimants who testified on the matter agreed with this assessment.[101] Claimants do not now allege that their flat-rate pay amounts to less than minimum wage over their specified shift or even for the combined period inclusive of any time they worked beyond that estimated shift time.  Rather, claimants now appear

---

[98]  *See id*.

[99]  *See id*. (emphasis added).

[100]  *See* ECF No. 845 at 17:9-23 (office manager testifying that the dairy paid milkers a shift rate in contrast to its other employees who the dairy paid an hourly rate); ECF No. 845 at 126:12-15, 127:4-8, 127:24-128:4; ECF No. 849 at 203:21-22 (herd manager testifying that the dairy paid a "shift" rate to "milk a certain number of cows" within the allotted eight hours, or until finished, but the pay structure was not based on the number of hours they worked); ECF No. 849 at 231:14-234:7, 234:22-235:2 (in response to claimants' counsel repeatedly pressing for a different answer, the herd manager repeatedly emphasized that the dairy did not pay its milking employees in segments of time).

[101]  *See* ECF No. 850 at 77:7-12, 80:18-20, 90:19-21, 91:21-92:14 (Alberto Flores acknowledging that his compensation was to milk a certain number of cows and that he would be paid the same whether it took less, or more, than eight hours); ECF No. 846 at 7:11-12, 20:7-12 (Hector Ibanez testifying that he was paid by the shift to milk a certain number of cows and that the eight hours scheduled was an estimation of how much time it should take); ECF No. 844 at 77:19-20, 94:18-95:6, 100:1-2 (Jesus Gallegos confirming that, while he was a milking employee, he was paid $130 per shift to milk a certain number of cows and that "[s]upposedly the amount of cows that [h]e had to milk corresponded to the eight hours"); ECF No. 849 at 103:11-12, 124:8-10, 133:7-22 (Jorge Ramirez testifying that, while he was a milking employee, he was paid by the shift to milk a certain number of cows); ECF No. 843 at 7:7-10 (Maria Guadalupe Velasquez testifying her rate of pay as $120 *per shift*); ECF No. 846 at 118:24-25, 127:12-128:3 (Maria Ochoa testifying that, while she was a milking employee, she was paid a flat rate to milk a certain number of cows regardless of the time it took); ECF No. 849 at 11:10-15, 27:11-13, 30:15-17 (Raul Vasquez confirming that he was paid to milk a certain number of cows rather than work a certain period).  One employee, Armando Madero, conceded on direct that that he was paid "[b]y the shift" and that he knew he would receive no additional pay for working beyond eight hours. *See* ECF No. 849 at 66:13-14, 71:7-10.  However, on cross examination, Mr. Madero reversed his testimony and baldly and continuously asserted that he was paid on an hourly basis for eight hours though presented with timecards showing he received a full day's pay when he worked less than eight hours, and he incorrectly stated that his timecards reflected an hourly rate.  *See id.* 80:22-23, 82:1-25, 84:10-87:11.  Further, Mr. Madero gave a lengthy series of evasive and nonresponsive answers to questioning on cross examination when counsel attempted to reconcile the several internal inconsistencies in the testimony presented at trial and the inconsistencies between that testimony and Mr. Madero's deposition testimony.  *See id.* 87:22-4, 88:23-89:13, 90:4-91:9.  The court eventually stopped the line of questioning after it became obvious that Mr. Madero intended to continue with his evasive and circular responses.  *See id.* at 91:10-11.

---

**MEMORANDUM DECISION**          Page 72

to propose that the allotted shift times of eight hours represent a temporal cap on the amount of time they must work to earn their shift rate (a cap that also works as a one-way ratchet against the employer). Thus, they argue, they received zero compensation for any time worked beyond the eight hours. The court finds the argument entirely unconvincing.

At the outset, it is important to note that the MWA does not divest employers and employees of the right to define the terms of an employment contract. Rather, under the MWA, "Washington employers and employees generally remain free to negotiate the terms of their employment relationship."[102] The parties exercised this freedom here and expressly agreed to compensation on a "task basis." As mentioned above, there is no reasonable dispute that the task here was to milk a certain number of cows, which might take more or less time than the estimated eight hours on any given day. However, unlike more typical flat-rate compensation agreements, those at issue here contained additional temporal features because every milk-producing cow on the dairy needed to be milked once per day. To achieve this goal, the dairy roughly divided the cows into three groups assigned to each milking shift.[103] The temporal feature in the contract allowed the dairy to ensure that all cows were properly relieved of their milk every twenty-four hours. Thus, the contract put this general time estimate on the task and explicitly provided that exceeding the estimate does not (i) relieve employees of the obligation to finish their task or (ii) entitle them to additional pay. By doing so, the contract makes evident that the employees must (1) milk a certain number of cows *and* (2) generally attempt to do so within a certain amount of time. In consideration for doing so, the dairy paid each employee his or her applicable flat rate. Based on these provisions, milking employees earned the same rate when they finished milking the cows allocated to their shift regardless of whether they finished earlier or later than the eight hours.[104]

Claimants ignore these explicit provisions and the conjunctive nature of their contractual obligations to recast the time limits in a manner that renders them

---

[102] *Hill v. Xerox Bus. Servs., LLC*, 181 Wash.2d 751, 761 (2018); *see also Dovex Fruit Co.*, 190 Wash. 2d at 619, 622 (2018) (twice reiterating that the MWA does not deprive employers and employees of the freedom to negotiate the terms of their employment contract, including by writing: "The statute does not restrict employers to a specific compensation structure" and "[t]he general principle that flexible compensation structures are permissible is not in question.").

[103] *See* ECF No. 845 at 126:16-127:3 (herd manager testified as to the method for determining the number of cows milked per shift).

[104] *See* ECF No. 845 at 127:12-18, 128:9-18, ECF No. 849 at 203:13-19 (herd manager testifying that employees got paid their entire rate if they finished early, showed up late, or went beyond the eight hours).

**MEMORANDUM DECISION**         Page 73

beneficiaries of a "heads-I-win-tails-you-lose" provision. Interpreted in the manner claimants suggest, the agreement required them to (1) milk a certain number of cows *or* (2) work eight hours. From this springs the tortured notion that the employees were paid nothing beyond the eight hours. However, for the reasons described above, this interpretation of the agreements is facially invalid.[105] Claimants point to no legal authority requiring that the agreements in this case be construed in the distorted manner they propose.[106]

For the reasons described above, the court finds no merit to this theory of liability and rejects it in its entirety.[107]

## II. Unpaid milking days

Claimant Maria Velasquez asserts that she allegedly was not paid for three of the eight days she allegedly worked at the dairy. The court concludes that Ms. Velasquez's claim cannot be allowed, for both procedural and substantive reasons.

***First***, as a procedural matter, Ms. Velasquez failed to advance this theory of liability until she took the stand to testify at the evidentiary hearing in April 2021 (i.e., the theory was not articulated in a timely proof of claim, pre-hearing supplement to a proof of claim, or pre-hearing briefing). Permitting the assertion of a new late claim long after the claims bar date ran requires consideration of the

---

[105]  Such an interpretation also defies logic. Because milking employees received the same rate whether they completed their task in six or eight hours, they captured the net benefit of performing efficiently (the record reflects that various of the claimants worked for less than eight hours, and hence got to go home early, while nevertheless being paid for the full shift). Claimants' proposed construction would instead reward them for performing inefficiently by paying them additional amounts for failing to meet their temporal obligations at the employer's expense. This is a one-way ratchet to which no rational employer would agree. The court also notes that the dairy might have imposed monetary penalties for the employees' failure to meet the deadline, which would have only further highlighted the purpose of the temporal estimate.

[106]  Claimants cite *Carranza v. Dovex Fruit Co.*, 190 Wash. 2d 612 (2018), as general authority for their position, but *Dovex Fruit* is distinguishable in key respects. First, *Dovex Fruit* involved a dispute regarding agricultural workers who were paid on a piece-rate basis for piece-rate picking work, whereas this case involves a dispute regarding dairy workers who were paid on a task or shift basis. Second, the workers in *Dovex Fruit* were performing activities outside of piece-rate picking work (so-called "down time"), whereas the alleged "extra" work in this case was all fairly encompassed within the broader task or shift work itself.

[107]  The court notes that any damages on this claim would be negligible. While claimants contend that they should receive pay for any time above eight hours as reflected on their timecards, the court found above that milking claimants presented insufficient evidence to demonstrate they failed to receive meal periods before the time the dairy began requiring these employees to clock out for such periods. As a corollary, milking employees received at least thirty minutes of ***paid*** meal periods during their shifts. Thus, on the present theory for damages, claimants could be awarded damages only for any days they worked longer than eight hours and thirty minutes. A review of the relevant timecards shows some claimants had no such entries and the remaining claimants had few.

---

**MEMORANDUM DECISION**          Page 74

so-called "*Pioneer* test" for whether there has been "excusable neglect," which includes four factors: "(1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith."[108]

Claimants do not address the *Pioneer* test or explain why there has been some excusable neglect.[109]  The court concludes that there has not been excusable neglect in this context.  Ms. Velasquez's theory of liability was asserted exceedingly late in the process – almost two years after the original Claim No. 43 was filed.  The theory was further not included in the pre-hearing claims supplementation that the claimants provided to the debtors in August 2020 or otherwise presented to the court.  The absence of an effort to identify and assert this additional theory of liability occurred despite the fact that claimants' counsel in the meantime had identified – and specifically sought and obtained court authority to assert – other new theories of liability based on the alleged sexual harassment of several claimants.[110]  No reason has been articulated why the claim Ms. Velasquez asserted for the first time on the stand could not have been identified at one of several possible earlier junctures in the litigation.  In any event, the delay in asserting this new theory not only was substantial and unexplained, but also was prejudicial to the debtors.  The debtors had no opportunity to investigate the merits of the alleged claim (such as through a deposition or other discovery) before the evidentiary hearing, but instead had to respond to a brand new claim that was being articulated for the first time in the midst of Ms. Velasquez's testimony.  Such "trial by ambush" is simply not fair to the debtors.  For all these reasons, then, the *Pioneer* test has not been satisfied and Ms. Velasquez's dilatory claim must be disallowed as untimely.

***Second*** and alternatively, based on the evidence presented, Ms. Velasquez's claim fails on the merits.  Ms. Velasquez contended that she started working for the dairy on March 1, 2018, and there is no dispute that her last day was approximately a week later on March 8, 2018.[111]  Ms. Velasquez testified that she

---

[108]   *See, e.g., Chanchiang v. Xenon Pictures, Inc*., 624 F.3d 1253, 1261 (9th Cir. 2010) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

[109]   Claimants instead posture this issue as one regarding whether a "midtrial amendment" should be permitted under Federal Rule of Civil Procedure 15 (made applicable in certain contexts by Federal Rule of Bankruptcy Procedure 7015).  *See* Claimants' Post-H'rg Br., ECF No. 851 at 37-40,.  Case law demonstrates, however, that Rule 15 is not applicable in the context of bankruptcy proof of claims and that the applicable legal standard is the *Pioneer* test.  *See, e.g., In re Tisch*, 628 B.R. 60, 66, 69 (Bankr. W.D. Mich. 2021).

[110]   *See* ECF Nos. 651 (May 2020 motion), 693 (August 2020 order).

[111]   *See* ECF No. 843 at 6:6-7; Ex. 44 at 4459.

ultimately quit the dairy after her paycheck revealed that "she was missing some hours."[112]  Ms. Velasquez testified that, two or three days after receiving the paycheck, she tried to rectify the problem first with her foreman without success and then with "the secretary" with similar results.[113]  Due to the dairy's alleged refusal to remedy the problem, Ms. Velasquez testified she terminated her employment with the dairy.[114]  Ms. Velasquez repeatedly insisted that she quit after learning of the allegedly missing compensation from her paycheck.[115]  However, as she finally conceded on cross examination, Ms. Velasquez's paycheck itself reflects that she received the check on March 20, 2018 – twelve days *after* she quit.[116]  Ms. Velasquez could not explain the discrepancy between her memory and the evidence and finally conceded that "I don't recall it anymore" while still insisting she quit the dairy due to the pay discrepancy.[117]  While the court makes no finding regarding Ms. Velasquez's motivations or intentions behind the inaccurate testimony, the court does find her testimony on this matter unbelievable due to the sequential impossibility.  Moreover, Ms. Velasquez asserted that the dates of her employment were recorded on Facebook and reflected in a Facebook "memory" that she received, but the underlying Facebook materials were never introduced into evidence to support (or perhaps to undermine) her bare recollection, which is subject to doubt for the reasons noted above.  Given the record presented to the court, Ms. Velasquez's claim for unpaid wages fails on the merits.

### *Interest on Unpaid Wages*

Claimants seek prejudgment interest on any unpaid amounts due to them at an annual rate of 12% pursuant to RCW 19.52.020(1).  The authorities cited by claimants generally establish their entitlement to prejudgment interest in this context.  Nevertheless, as claimants acknowledge, the accrual of interest ceases as of June 13, 2018 (i.e., the day before the June 14 bankruptcy petition date).[118]

---

[112]  *See* ECF No. 843 at 6:18-7:7, 36:23-37:6.

[113]  *See id*. at 6:21-7:729:14-20, 37:7-38:7.

[114]  *See id.* at 38:21-39:3.

[115]  *See id.* at 6:18-22, 38:25-39:3, 44:20-45:4.

[116]  *See id.* at 45:5-13; *see also* Ex. 44 at 2962.

[117]  *See* ECF No. 843 at 45:14-20.

[118]  The Bankruptcy Code disallows postpetition interest on any claims, such as claimants' claims, that are unsecured prepetition claims.  *See* 11 U.S.C. § 502(b)(2).

**MEMORANDUM DECISION**     Page 76

In calculating the precise amount of interest due to particular claimants, the court has done so on an annualized basis, with the amount of all meal-period violations occurring in a particular calendar year relating back to the first violation during that year and the aggregate interest for each year then calculated from that date through June 13, 2018. The court has adopted this methodology for several reasons. First, the primary alternative method would require individual interest calculations too numerous for the court to feasibly perform. Second, since the violations were recurring throughout the year in many instances, it is appropriate to relate the violations back to the first instance in the same year. Third, this calculation methodology errs slightly in claimants' favor, which is fair and equitable under the circumstances given that the debtors' bankruptcy process eliminated postpetition interest on claimants' claims while allowing retention of the Mensonides family's residual equity interests in the dairy.[119]

The specific amounts of prejudgment interest regarding each claimant are detailed in a chart contained in the separate order accompanying this decision.

### Exemplary Damages

Claimants contend that they are entitled to additional damages because debtors willfully and intentionally deprived claimants of their wages.[120] "Under Washington law, an employer who violates the MWA owes its employees double exemplary damages unless certain exceptions apply."[121] Specifically, pursuant to RCW 49.52.050 and .070, employers are "liable in a civil action by the aggrieved employee . . . to judgment for twice the amount of wages unlawfully . . . withheld by way of exemplary damages" if the employer "[w]illfully and with intent . . . deprive[s] the employee of any part of his or her wages."[122] Washington courts have set forth two instances when a court may find that "an employer's failure to pay wages is not willful: the employer was careless or erred in failing to pay, or a 'bona fide' dispute existed between the employer and employee regarding the payment of wages."[123] A finding of "[c]arelessness or inadvertence negates the

---

[119] *Cf.* 11 U.S.C. § 726(a)(5) (distribution scheme applicable in chapter 7 liquidations includes some postpetition interest, albeit at the federal judgment rate, in a solvent-debtor case).

[120] *See* Claimants' Post-H'rg Br., ECF No. 851 at 53-65.

[121] *Hill v. Garda CL Nw., Inc.*, 191 Wash. 2d 553, 556 (2018) (citing RCW 49.52.050, .070).

[122] *See* RCW 49.52.050(2), 49.52.070.

[123] *Schilling v. Radio Holdings, Inc.*, 136 Wash. 2d 152, 160, (1998) (en banc). Note that Washington courts appear to analyze whether an employer was willful or acted with intent under similar analyses rather than as

willfulness necessary to invoke double damages under RCW 49.52.070."[124]  A finding related to "whether an employer acts 'willfully' for purposes of RCW 49.52.070 is a question of fact."[125]  Since the only damages awarded here are based on noncompliant meal periods, the analysis here is limited to whether the debtors "willfully and with intent" deprived claimants of the associated wages.  The court finds that the debtors did not.

As discussed above in great detail, the record contains no credible evidence that the dairy made efforts to deprive its employees of meal periods or any wages associated with noncompliant periods.  As to the meal periods themselves, the court finds that the dairy largely gave its employees as much time as they needed.  While addressing the matter above, the court addressed and identified only those meal periods of noncompliant duration.  However, the timecards reveal that the overwhelming majority of meal periods across all employees were compliant in duration, often exceeded one hour by a significant margin, and not uncommonly approached or exceeded two hours (which not only is compliant with the legal minimum, but also reflects a discretionary accommodation by the dairy for employees who needed a longer break for whatever reason).[126]  At base, the number of noncompliant meal periods are insignificant when considered over the much larger amount of time they accrued.  Additionally, many, if not most, of the noncompliant periods result from only a matter of a few minutes, further evidencing the dairy's lack of intent to withhold meal periods.  The court awarded damages for what the record demonstrates are technical, or inadvertent, violations rather than the dairy's systematic efforts to truncate meal periods or deprive any workers of their rights under Washington law.  Further, as noted when discussing each claimant's testimony, several claimants failed to even allege that their allegedly missed meal periods resulted for actions by the dairy.  In the end, any meal periods of noncompliant duration proved to be the exception rather than the rule.

Likewise, the court finds that any failure to pay wages for these technical violations resulted from the dairy's inadvertence or carelessness.  The court found

---

distinct factors.  *See id.* ("Lack of intent may be established either by a finding of carelessness or by the existence of a bona fide dispute." (citation omitted)).

[124]  *See id.*

[125]  *See id.*

[126]  *See, e.g.*, Ex. 10 at 13 of 77 (showing that all but one of Jose Noel Ceja's meal periods exceeded one hour for the pay period); Ex. 23 (Ana Cruz's timecards showing overwhelming majority of her meal periods exceeded one hour, a significant number approached two hours, and others exceeded two).

**MEMORANDUM DECISION**          Page 78

that the dairy allowed the employees to police their own meal periods and simply paid the amounts reflected on the time records. Due in large part to this self-reporting, the dairy likewise also carelessly and inadvertently paid for a large number of meal periods employees actually took but for which they failed to record on their timecards as the court found above.[127] To be sure, these were mistakes that ought to have been caught or corrected at the time, but the law does not require perfection to avoid an exemplary damages penalty. Finally, as discussed in detail above, the dairy also permitted its employees to police their own paid rest breaks and likely paid for far more rest breaks than legally required. In light of this, the court cannot attribute intent or willfulness to the dairy's failure to pay wages for noncompliant meal periods while ignoring that the dairy paid for numerous meal periods and rest breaks for which it was not liable. Based on the foregoing, the court finds that any failure to pay the wages at issue was not willful or intended, but resulted from the dairy's carelessness and inadvertence. As such, the claimants are not entitled to any award of exemplary damages or any other relief predicated on RCW 49.52.050 and .070.

### Attorneys' Fees

Claimants seek recovery of their attorneys' fees under RCW 49.48.030, which generally authorizes the assessment of "reasonable attorney's fees, in an amount to be determined by the court," against the employer in an action to recover unpaid wages or salary. "Washington courts have interpreted RCW 49.48.030 broadly" and permitted the recovery of fees "whenever a judgment is obtained for any type of compensation due by reason of employment," even if the compensation is not strictly considered wages or salary.[128] The amount of fees that are "reasonable" to award in a particular case is a question within the "broad discretion" of the trial court.[129]

Claimants have offered no record of hours invested in this litigation or other basis on which the court could perform a "lodestar" or similar analysis. Instead, claimants simply propose to defer the issue until a later date at which they "will seek a specific monetary request for attorneys' fees and costs and provide the methodology used to calculate those amounts upon entry of a judgment ordering Debtors to pay Claimants amounts owed for unpaid wages or upon further

---

[127] *See, e.g.*, nn. 91, 94 *supra*.

[128] *See, e.g.*, *Bates v. City of Richland*, 112 Wn. App. 919, 940 (2002).

[129] *See, e.g.*, *Bearden v. McGill*, 193 Wn. App. 235, 252 (2016).

**MEMORANDUM DECISION**       Page 79

instruction by the court."[130]  The court does not believe deferral of this issue is appropriate, however, particularly since the court previously relayed some initial views about what might be a reasonable attorneys' fee in this matter to counsel on the record and requested that claimants address those issues in their post-hearing briefing, which claimants apparently decided not to do.  Indeed, the court expressly requested that the parties' post-hearing briefing address ***all*** components and details of claimants' asserted claims so that the court could render a final decision in what has already been very lengthy and resource-consuming litigation.  There is no purpose to be gained by deferring this issue as claimants propose or inviting additional rounds of briefing.  Nothing prevented claimants from setting forth their proposed fee methodology or providing various potentially relevant information (such as hourly rates, hours worked thus far, estimates of hours to be worked, and the like) as part of their post-hearing briefing.[131]

In any case, the court does not believe a traditional "lodestar" fee methodology is workable in this context.  Claimants' counsel has undoubtedly devoted many hours ***in the aggregate*** to litigating an array of interrelated wage-and-hour theories, including numerous witness interviews, depositions, in-court hearings, and the like.  Claimants, however, have not succeeded on the majority of the claims pursued and it would likely be impossible to disaggregate counsel's time to allow for some meaningful estimate of the hours specifically associated with the successful claims.  Put differently, given the wide-ranging and expansive nature of the claims and case pursued by claimants, the overall time spent by counsel regarding that whole case is not a relevant or useful metric for assessing what would be a reasonable fee regarding the far smaller universe of valid claims.[132]

Instead, in this unique context, it is more appropriate to focus on the actual results obtained, to which results any awarded fees must ultimately bear a reasonable calibration under Washington law.[133]  Here, the results obtained are allowed prepetition claims for all the claimants in the aggregate amount of $24,646.05.  The court does not believe it appropriate to award claimants' counsel

---

[130]  *See* Claimants' Post-H'rg Br., ECF No. 851 at 66.

[131]  The burden of supporting the reasonableness of a requested fee falls on the fee applicant.  *See Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 151 (1993).

[132]  *See, e.g.*, *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597 (1983) ("The court must limit the lodestar to hours reasonably expended, and should therefore discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time.").

[133]  *See, e.g.*, *Ethridge v. Hwang*, 105 Wn. App. 447, 461 (2001).

**MEMORANDUM DECISION**          Page 80

fees in excess of that aggregate amount, which effectively constitutes the judgment to be entered in claimants' favor. Several considerations support this conclusion, including:

- The evidence supporting liability regarding the successful claims almost exclusively consists of timecards that are business records of the dairy. It does not require substantial legal effort or ability to obtain those records and have them introduced into the record (indeed, the debtors stipulated to the authenticity and admissibility of these documents on almost a wholesale basis). The live witness testimony of several claimants solicited by claimants' counsel often only eroded the evidentiary weight of the timecards themselves.

- Although the court has concluded that the were some technical violations of Washington law relating to meal periods, the bases for this liability do not track the broader theories of liability urged by claimants' counsel, which the court found largely baseless for reasons already discussed.

- The court's determination of specific noncompliant meal periods and calculation of the resulting claims required ***the court*** to review each individual timecard in the record. The summaries that claimants' counsel purported to offer in an effort to support claimants' damages were unclear, difficult to follow, aggregated with nonviable theories, and in many instances not possible to reconcile with the court's own work.

- The litigation effort pursued by claimants' counsel required the debtors to incur substantial legal fees to defend. The debtors' defense efforts were largely successful, and it would be unreasonable to require the debtors to bear their own significant defense costs associated with the various unsuccessful theories advanced by claimants while also being required to pay claimants' counsel enhanced fees related to the successful theories. In other words, it would be inequitable to allows claimants to indiscriminately use the debtors as way to fund the prosecution of a panoply of claims that, while perhaps not frivolous, lack merit without considering that the debtors also have had to bear the costs of defending against the same claims.

- Given the amount realistically in dispute and the magnitude of the claims ultimately allowed for claimants, it would be excessive and unreasonable for

claimants' counsel to receive a fee award larger than the amounts actually recovered by claimants.[134]

The court's limitation of the amount of a reasonable fee award in this matter is not based on a per se rule that an award of fees in excess of the judgment amount is unreasonable, but rather based on the unique context of, and events that occurred during, this litigation, specifically including the nature of claimants' counsel's work during the evidentiary hearing and in related briefing, as well as the specific attributes of the bases the court has found for imposing liability on the debtors.

Because claimants' attorneys' fees arise from and relate from claimants' prepetition unsecured claims, the fees are likewise properly treated as unsecured claims that are similarly payable under the debtors' plan as Class 12 claims.[135]

In sum, based on the totality of the record before the court and the entire history of this litigation, the court determines that $24,646.05 constitutes a reasonable fee for purposes of RCW 49.48.030.

## SUMMATION

The debtors' objection to proof of claim number 43 is sustained in part and overruled in part for the reasons discussed above. Claimants are entitled to certain allowed Class 12 or Class 13 claims to the extent detailed above, which claims will be satisfied in accordance with the debtors' chapter 11 plan. The court will enter a separate order consistent with this written decision.

---

[134] *See, e.g., ADA Motors, Inc. v. Butler*, 7 Wn. App. 2d 53, 68 (2018) ("But a key consideration is the proportionality of the award of fees to the amount in controversy. . . . For purposes of proportionality analysis, the amount in controversy necessarily requires consideration of the actual amount recovered on a claim."); *Berryman v. Metcalf*, 177 Wn. App. 644, 660-61 (2013) (discussing concerns about excessive fee award in light of judgment amount; noting how "[i]n assessing the reasonableness of a fee request, a 'vital' consideration is the size of the amount in dispute in relation to the fees requested").

[135] *See, e.g., SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 840-45 (9th Cir. 2009).